STATE OF NORTH CAROLINA v. MYRON EARL PRIDGEN

No. 226A84

(Filed 27 February 1985)

1. **Criminal Law § 87.1— leading questions**

The trial court did not abuse its discretion in permitting the prosecutor to ask certain leading questions of several witnesses who were inarticulate, reticent, and generally unable to communicate clearly.

2. **Criminal Law § 66.2— identification testimony—effect of equivocation by a witness**

The trial court did not err in allowing photographic identification testimony by a witness who testified that she had identified defendant's photograph as the one most closely resembling a man she saw on the night of the crime but that she couldn't be sure, since a witness's equivocation on the question of identification does not render the testimony incompetent but goes only to its weight.

3. **Criminal Law § 169.3— objection sustained—other evidence of same import—absence of prejudice**

Defendant was not prejudiced when the trial court sustained the prosecutor's objection to an answer given in response to a question which the prosecutor himself asked the witness on redirect examination where the same evidence was repeatedly elicited during cross-examination of the witness.

4. **Homicide § 15— photograph and location of third person's house—relevancy to show motive**

In a prosecution for first-degree murder, a photograph of and evidence as to the location of a third person's house were relevant to establish that the

motive for the murder was to prevent the victim from testifying in a criminal case against defendant and the third person and that the third person was one of two men seen with the victim at the time of his disappearance.

**5. Homicide § 15— location of defendant's house—relevancy to show opportunity**

Testimony concerning the location of defendant's house with respect to the murder scene was relevant to establish that defendant's opportunity to murder the victim was enhanced by the proximity of his house to the crime scene.

**6. Criminal Law § 34.7— pending charges—evidence competent to show motive**

Evidence pertaining to charges pending against defendant for forgery and failure to return a rental tool was admissible in a murder trial to prove that the motive for the murder was to prevent the victim from testifying against defendant.

**7. Criminal Law § 66— identification of defendant—size comparison**

The trial court properly permitted two witnesses to testify that the driver of a car in which a murder victim disappeared was the same size and about the same height and weight as defendant.

**8. Criminal Law § 42.5; Homicide § 20— identification of car—equivocation in testimony**

Testimony by two witnesses identifying a car parked in defendant's yard as the one they had seen on the night of a murder was not rendered inadmissible because the witnesses testified that the car "looked like" or "appeared to be" the same car they had previously seen. Whatever equivocation attended their testimony went to its weight, not its admissibility.

**9. Constitutional Law § 30; Bills of Discovery § 6— discovery of proposed testimony—admissibility of substantially similar testimony**

Where trial testimony is substantially similar to what in substance was provided to defendant during discovery, and variations are attributable to the addition or elaboration of detail or are merely changes in vocabulary or syntax, the testimony is admissible and in full compliance with our discovery rules. Therefore, where defendant was provided well in advance of trial with proposed testimony that defendant told the witness that he was going to "take care of" the victim, the trial court properly ruled that testimony by the witness that defendant stated that "he might get somebody to shoot" the victim was admissible because there had been substantial compliance with G.S. 15A-903(a)(2).

**10. Homicide § 15— route from murder scene—admissibility to show opportunity**

Testimony regarding the route one might take from the street where a murder victim was last seen to the street where the body was found was relevant to establish the opportunity for defendant to commit the crime.

**11. Criminal Law § 53.1; Homicide § 15.4— range of gunshot—testimony by pathologist**

A pathologist was qualified to give his opinion that one gunshot wound was inflicted to the victim's head at close range and that a second wound was inflicted with the barrel of the weapon more than six inches from the skin.

**12. Criminal Law § 53.1; Homicide § 15.4— time of death—expert testimony**

A doctor who performed an autopsy could give an opinion as to the time of death based on the probable lapse of time between the victim's last ingestion of food and the victim's death.

**13. Criminal Law § 50.1; Homicide §§ 15.4, 18.1— murder victim alive when clutched grass—testimony by medical doctor—relevancy**

A medical doctor was qualified to state an opinion that a murder victim was alive when he clutched grass which was found in his hand, and such testimony was relevant to establishment both that the victim was shot at the crime scene and that the murder was committed with premeditation and deliberation.

**14. Homicide § 15.4— position of body when wound inflicted—testimony by medical doctor**

A medical doctor who examined a murder victim's body at the crime scene was properly permitted to state an opinion as to the position of the victim's body when the fatal wound was inflicted.

**15. Homicide § 15.4— time of death—testimony by medical doctor**

A medical doctor was properly permitted to state an opinion as to the time of death based upon the doctor's at-the-scene examination of the body and other physical evidence available.

**16. Homicide § 21.5— premeditation and deliberation—defendant as perpetrator—sufficiency of evidence**

There was sufficient evidence of premeditation and deliberation to support a charge against defendant of first-degree murder where the evidence tended to show that defendant had threatened the victim prior to the murder; following the murder defendant exhibited a callous and smug attitude toward the victim's death; the body was concealed at the side of a deserted dirt path; there had been ill will between defendant and the victim over the victim's impending court testimony against defendant in a criminal case; and the victim was shot three times in the head. Furthermore, evidence of the victim's disappearance in a car later identified as belonging to defendant, together with other facts and circumstances tending to prove that defendant drove the car and that the victim was killed a short time later, was sufficient to support a jury finding that defendant was the perpetrator of the crime.

**17. Criminal Law § 113.7— charge on aiding and abetting and acting in concert**

In a prosecution for first-degree murder in which the evidence would permit the jury to infer that another man was with defendant when the victim was murdered, the trial court properly instructed the jury on aiding and abetting and acting in concert to insure that the jury understood that, irrespective of who actually shot the victim, defendant would be equally guilty under the theories of acting in concert and aiding and abetting.

**18. Criminal Law § 131.2— newly discovered evidence—denial of new trial**

The trial court did not abuse its discretion in denying defendant's motion for appropriate relief in a first-degree murder case based on newly discovered

evidence consisting of testimony that a blue and white Monte Carlo was seen in the vicinity of the crime scene approximately three hours before the victim's body was discovered where the trial court found that all the medical evidence showed that deceased died around eighteen hours before the body was found, and that there was no valid evidence to suggest any improper purpose on the part of any occupant of the blue and white Monte Carlo.

Justice VAUGHN did not participate in the consideration or decision of this case.

APPEAL by defendant from *Peel, J.*, at the 5 December 1983 Criminal Session of WAYNE County Superior Court pursuant to N.C.G.S. § 7A-27(a).

Defendant was charged in a bill of indictment with the kidnapping of Robert Earl Stephens and with the first-degree murder of Robert Earl Stephens both occurring on or about 13 June 1983. The district attorney dismissed the kidnapping charge during the course of the trial. The jury returned a verdict of guilty of first-degree murder. A sentencing hearing was held and the jury recommended a sentence of life imprisonment.

*Rufus L. Edmisten, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, for the State.*

*R. Gene Braswell and S. Reed Warren, for defendant appellant.*

BRANCH, Chief Justice.

Defendant brings forward twenty-eight assignments of error. He challenges the sufficiency of the evidence to sustain his conviction, and most of the remaining assignments of error are directed to evidentiary rulings of the trial judge.

The State offered evidence tending to show that on 14 June 1983 at approximately 6:00 p.m. the body of Robert Earl Stephens was discovered concealed beside a dirt path at the end of a residential street in Goldsboro, North Carolina. The victim had been shot three times in the left side of his head. An autopsy disclosed that the victim had been dead for at least twelve hours due to the large number of maggots detected on the face area. An examination of the contents of the victim's stomach indicated that death occurred approximately six to ten hours after the victim had last eaten. There was testimony that prior to his disappearance on 13

June, the victim had eaten chicken at approximately 6:30 p.m., and cornflakes at approximately 8:00 p.m. Hence the time of death was estimated to be between midnight and the early morning hours of 14 June. Scrape wounds on the victim's body and physical evidence along the dirt road were consistent with the victim's having been dragged down the dirt road from where blood was first detected to where the body was located. The victim was clutching dried grass in his hand.

There was testimony that at approximately 11:30 p.m. on 13 June, as the victim left the apartment of a friend where he had been cutting hair, he was beckoned to a car, a brown and beige Camaro, by a man meeting defendant's description — a tall, slim, well-dressed black male. The victim left his hair clippers on his car, walked toward the Camaro, got into the car and was driven away. The Camaro had a dent in the side, chrome wheels, and there was a red and green sticker next to the license plate. In addition to the victim and the tall, slim man, there was a shorter stockier man in the Camaro as it drove away. Prior to leaving with the victim, the tall, slim man approached a nearby car, a Datsun 280-Z, and spoke to the two occupants. He stated that he knew someone who drove a 280 at "O'Berry or Cherry."

There was evidence that the victim was scheduled to appear in court in Kinston on 14 June to testify against defendant on charges of forgery and failure to return rental property. The victim was with defendant on 29 March when defendant rented a motor hoist using the identification of a neighbor, Frank Dawson.

A co-worker testified that while he and defendant were working at the O'Berry Center, defendant discussed the pending forgery and rental property charges, called the victim a "rat," and intimated that he would "take care of" the case by "taking care" of the victim or having someone else do it. Following the murder, defendant smiled and stated "somebody got that boy."

Approximately two weeks after the murder, defendant was seen at a local club. When asked if he knew anything about the murder he replied that he did, but he wouldn't say anything. He pointed his finger to his head and said "Bang, bang, bang." That same evening another witness asked defendant if he had killed Ron Stephens, to which defendant replied "I ain't going to say I did or I didn't because if I do I might get the reward, you know,

the reward money for it."[1] The victim's brother also encountered defendant at a club and heard defendant say "I'm glad the mother f---- is dead. He needed to be killed."

In order to ascertain the identity of the driver of the brown and beige Camaro, law enforcement officers drove around the area with the various witnesses looking for the car. The witnesses identified a Camaro which was parked in the yard of defendant's house as the one in which they saw the victim leave. The Camaro was registered in defendant's name.

A passenger in the Datsun 280-Z was shown a photo array in an effort to identify the man who had spoken to her and her boyfriend on the night of 13 June. She selected defendant's photograph as the one which came "closest" to the man she had seen, noting that it "favored" the well-dressed man. No in-court identification was made. However, the witness's photo identification testimony was allowed with limiting instructions that it not be considered as positive identification.

Finally, the State presented the testimony of an inmate at the Wilson County jail. Defendant had been arrested on 16 June on the forgery and rental property charges and was later released on bond. While in the Wilson County jail, defendant had suggested to the witness that he contact the sheriff's department and disclose the following: that defendant had discussed the murder with him; that the murder was connected to a drug transaction; that defendant was approached on the night of the murder by the victim and a man named Rodriques who offered to sell him cocaine for $2,400; that the victim and Rodriques left arguing; that Rodriques came back alone; and that Rodriques was now "in South Carolina somewhere in a river" because "he did [some white people] wrong so he ended up with all the money that night."

[1] Defendant first contends that the trial judge erred in failing to sustain objections to numerous leading questions propounded by the State in its effort to elicit testimony from various witnesses. Defendant has excepted to forty-four such questions. Of these, we agree that many are leading. Our reading of the tran-

---

1. The trial judge excluded evidence that a newspaper article appeared that day referring to a reward sponsored by "Crime Stoppers."

script, however, indicates that the prosecutor was handicapped in having to elicit testimony from several witnesses who were inarticulate, reticent, and generally unable to communicate clearly. The trial judge and the prosecutor frequently found it necessary to ask the witnesses to repeat or explain answers. Nevertheless, the trial judge repeatedly cautioned the prosecutor to avoid leading questions and occasionally sustained defense counsel's objection to a leading question.

We have repeatedly held that it is within the sound discretion of the trial judge to allow counsel to use leading questions, and in the absence of an abuse of that discretion, the judge's rulings will not be disturbed on appeal. *State v. Wilson*, 311 N.C. 117, 316 S.E. 2d 46 (1984); *State v. Ziglar*, 308 N.C. 747, 304 S.E. 2d 206 (1983). Many of the objected-to questions in the present case, although technically leading, were designed to direct the witness's attention to the next subject of inquiry and the witness then elaborated on his "yes" or "no" answer with additional testimony. *See State v. Lynch*, 300 N.C. 534, 268 S.E. 2d 161 (1980). In many instances the subject matter of the leading question was otherwise properly elicited through later testimony by the witness himself or by other witnesses. *Id.* While the prosecutor's questioning of his witnesses was certainly not a model of trial advocacy, given the nature and circumstances of the questioning, we hold that the trial judge did not abuse his discretion in overruling defense counsel's objections. This assignment of error is rejected.

[2] Defendant contends that the trial court erred in allowing the identification testimony of Margaret Keech. Miss Keech was the passenger in the Datsun 280-Z. She testified that she had identified defendant's photograph as the one most closely resembling the man she saw on 13 June, but that she couldn't be sure. The trial judge, although not required to do so, gave a limiting instruction that the testimony was not to be considered as positive identification. We have held that a witness's equivocation on the question of identity does not render the testimony incompetent, but goes only to its weight. *State v. Church*, 231 N.C. 39, 55 S.E. 2d 792 (1949). *See State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981); *State v. Carson*, 296 N.C. 31, 249 S.E. 2d 417 (1978). We find these cases dispositive of the issue.

[3] Defendant also contends that the trial judge erred in sustaining the prosecutor's objection to an answer given in response to a question which the prosecutor himself asked Miss Keech on redirect examination. Defendant argues that by sustaining the objection, the trial judge essentially permitted the prosecutor to impeach his own witness. The prosecutor's question and the objected-to answer were as follows:

Q. You said that you told your boyfriend about the picture after you picked it out?

A. Yes, sir.

Q. What did you tell him?

A. I told him that the picture we looked at that that was the best one that looked like him of all of the other pictures but I couldn't be sure.

Without speculating as to why the trial judge sustained the prosecutor's objection to this answer, we simply note that this same evidence was repeatedly elicited during cross examination of the witness, thus the defendant has failed to demonstrate how he was prejudiced by the trial judge's ruling. *See State v. Walden*, 311 N.C. 667, 319 S.E. 2d 577 (1984); *State v. Wood*, 310 N.C. 460, 312 S.E. 2d 467 (1984). This assignment of error is rejected.

[4] Defendant next contends that the trial court erred in failing to sustain his objection to testimony concerning Frank Dawson. The State was permitted to introduce a photograph of Dawson's house and to establish the location of the house with respect to the murder scene. Defendant argues that the testimony was irrelevant and highly prejudicial. The State claims that the evidence tended to establish facts in issue, to wit: defendant and Dawson were involved in a scheme to unlawfully procure a rental tool; that the motive for the murder was to prevent the victim from testifying against them; and that Dawson was one of the two men in the Camaro with the victim when he disappeared. Our long-standing law on the issue of relevancy[2] supports the State's

---

2. This case was tried before the effective date of the North Carolina Rules of Evidence, N.C.G.S. § 8C-1, Rule 401, however, would permit a similar result.

position: " 'In criminal cases, every circumstance that is calculated to throw any light upon the supposed crime is admissible,' and 'Testimony is relevant if it reasonably tends to establish the probability or improbability of a fact in issue.' " 1 Brandis on North Carolina Evidence, § 78 (1982) and cases cited thereunder. Furthermore, we recently reiterated that

> [I]t is not required that the evidence bear directly on the question in issue, and it is competent and relevant if it is one of the circumstances surrounding the parties, and necessary to be known to properly understand their conduct or motives, or to weigh the reasonableness of their contentions.

*State v. Stanley*, 310 N.C. 353, 365, 312 S.E. 2d 482, 490 (1984). We do not agree that the probative value of this evidence (a photograph and location of Dawson's house) was outweighed by whatever prejudicial effect it might have had. This assignment of error is rejected.

[5] Likewise we reject defendant's contention that testimony concerning the location of his house with respect to the murder scene was irrelevant. This evidence was relevant and properly admitted to establish that defendant's opportunity to murder the victim was enhanced by the proximity of his house to the scene of the crime. *Id.*

[6] Defendant contends that the trial judge erred in failing to grant his motion in limine to exclude evidence pertaining to charges pending against him for forgery and failure to return a rental tool and to allow testimony concerning those charges at trial. The evidence was clearly admissible to prove motive. *See State v. Adcox*, 303 N.C. 133, 277 S.E. 2d 398 (1981); *State v. Jones*, 299 N.C. 298, 261 S.E. 2d 860 (1980); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied*, 448 U.S. 907, *reh. denied*, 448 U.S. 918 (1980); *State v. Adams*, 245 N.C. 344, 95 S.E. 2d 902 (1957).

[7] Defendant next contends that the trial judge erred in allowing a witness who was present when the victim disappeared in the Camaro to compare the driver of the Camaro with defendant.

In addition to Miss Keech, there were two other witnesses, Hinnant and Stephens, who were present when the victim was beckoned by a man driving a Camaro and ultimately driven away.

Both witnesses, although unable to make a positive identification, described the man as tall, slim and black. Without objection, Hinnant testified that the man he saw was the same size as defendant. Prior to Hinnant's testimony, defendant had objected when the prosecutor asked Stephens to compare the size of the man he saw with the size of defendant. Stephens replied "It's about the same height, about the same weight." We agree with the State that the testimony was relevant and admissible. As noted earlier, positive identification is not required in order for identification testimony to be admissible. *State v. Church*, 231 N.C. 39, 55 S.E. 2d 792 (1949). Furthermore, the same evidence was admitted, without objection, during the State's direct examination of Hinnant. Defendant has therefore waived his objection. *State v. Walden*, 311 N.C. 667, 319 S.E. 2d 577 (1984); *State v. Wood*, 310 N.C. 460, 312 S.E. 2d 467 (1984). The assignment of error is rejected.

[8] Defendant's next argument concerns the admissibility of testimony relating to the identification of the Camaro. Witnesses Hinnant and Stephens described the car in which the victim was seen leaving on the night of 13 June. Later the witnesses were taken by law enforcement officers to look for the car. Both identified a car parked in defendant's yard as the one they had seen on 13 June. Stephens recognized the car by the make (a Camaro), by the color (beige and brown), and by the chrome wheels. Hinnant recognized the car by its make, color, and by two other identifying features—a dent in the side of the door and a red and green sticker next to the license plate. Both witnesses testified that the car they saw in defendant's yard "looked like" or "appeared to be" the same car they saw on 13 June. Defendant contends that as neither witness positively identified the car in defendant's yard as the one he had seen earlier, the testimony was speculative and highly prejudicial. We disagree. Both witnesses had sufficient opportunity to observe the Camaro on the night of the murder and were able to identify it at a later time. Whatever equivocation attended their testimony went to its weight, not its admissibility. *See State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981). This assignment of error is rejected.

[9] Defendant next contends that his constitutional right to due process was violated when the trial judge failed to exclude certain testimony of witness Geddie on the grounds that the exact

testimony of the witness was not disclosed to defendant until just prior to the witness's taking the stand. Mr. Geddie worked with defendant at the O'Berry Center. Defendant was informed well in advance of trial that the State intended to call Geddie as a witness and was provided with a summary version of the witness's proposed testimony.[3] It was defendant's impression that Geddie would testify concerning a conversation he had had with defendant relating to the charges pending against defendant involving forgery and failure to return a rental tool. In the course of the conversation, defendant told Geddie that he was going to "take care of" the victim. During interviews with the witnesses a week before trial, the prosecutor learned that Geddie would testify that defendant stated that "he might get somebody to shoot [the victim]." This information was disclosed to defendant on the Friday before the Tuesday when the witness was scheduled to testify. The trial judge conducted a voir dire hearing on the admissibility of Geddie's proposed testimony. The judge concluded that the statement was admissible and that there had been substantial compliance with the discovery rules, N.C.G.S. § 15A-903. Defense counsel was provided with a copy of the statement and the trial judge ordered that defense counsel could defer cross examination of Geddie to any reasonable time during the case. We hold that the trial judge's rulings on this matter were entirely proper.

N.C.G.S. § 15A-903(a)(2), effective 14 July 1983, provides in pertinent part that upon motion of a defendant, the court must order the prosecutor:

(2) To divulge, in written or recorded form, the substance of any oral statement relevant to the subject matter of the case made by the defendant, regardless of to whom the statement was made, within the possession, custody or control of the State, the existence of which is known to the prosecutor or becomes known to him prior to or during the course of trial; . . . If the statement was made to a person other than a law-enforcement officer and if the statement is then known to the State, the State must divulge the substance of the state-

3. The district attorney's office for the eighth judicial district has an "open file" system making all statements by a defendant available to defense counsel upon request.

ment no later than 12 o'clock noon, on Wednesday prior to the beginning of the week during which the case is calendared for trial. . . .

Defendant made no request for voluntary discovery nor a motion to compel discovery, more than likely relying on the district attorney's "open file policy." We believe that the more prudent course and one which would insure statutory protections, would be to rely on statutory discovery procedures despite an "open file policy." Nevertheless, we agree with the trial judge that the prosecutor substantially complied with N.C.G.S. § 15A-903(a)(2) in that the *substance* of Geddie's statement was disclosed well in advance of trial. We believe that it would be unreasonable, if not impossible, for a prosecutor to anticipate the exact testimony of a witness. Additional details omitted under the stress or other circumstances of an initial interview may be recalled when the witness is later interviewed in preparation for trial. Moreover no witness can be expected to repeat verbatim on the stand what he or she has previously stated during interviews. Where, as in the present case, trial testimony is *substantially similar* to what in substance was provided during discovery, and variations are attributable to the addition or elaboration of detail or merely changes in vocabulary or syntax, the testimony is admissible, and in full compliance with our discovery rules. The assignment of error is overruled.

[10] Defendant argues that the trial court erred in failing to sustain counsel's objections to a question propounded to witness Stephens regarding the route one might take from Maple Street, where the victim was last seen, to Forsyth Street, where the body was found. The purpose of the testimony was to establish the opportunity for defendant to commit the crime inasmuch as 1) the defendant's Camaro proceeded in the direction of Forsyth Street as it left Maple Street on the night of the murder, and 2) Eastern Wayne High School, the vicinity in which Stephens and Hinnant later saw the Camaro, is on this route. The testimony was relevant as tending to establish defendant's opportunity and was therefore admissible. 1 Brandis on North Carolina Evidence, § 78 and cases cited thereunder.

[11] Dr. Wolf, an expert in forensic pathology, conducted an autopsy on the victim. During the course of his testimony, he was

permitted to give his opinion that a gunshot wound inflicted to the victim's head was a "close range gunshot wound;" that with respect to a second wound, the barrel of the weapon "was greater than six inches from the skin;" and that a bullet found under the victim's head "looked like about a .22 caliber." Defendant contends that his objections to this testimony should have been sustained. He argues that the witness was not a ballistics expert and that "[t]he purpose of all these questions was to emphasize that a gun was used at relatively close range, and irrelevant to determining the identity of the individual that shot Robert Earl Stephens."

An expert certified in pathology is qualified to give an opinion regarding the range from which a gun might have been fired when that opinion is incident to his examination. *State v. Mack*, 282 N.C. 334, 193 S.E. 2d 71 (1972). The testimony was not offered to establish the identity of defendant as the perpetrator of the crime. The testimony tended to indicate that the victim was shot at the scene as he lay on the roadside and the perpetrator stood over him. We find no error.

[12] Dr. Wolf was also permitted to offer an opinion as to time of death. Defendant contends this was error. The opinion was based upon the doctor's examination of the body which included an examination of the victim's gastro-intestinal tract. A doctor who performs an autopsy may give an opinion as to time of death based on the probable lapse of time between the victim's last ingestion of food and the victim's death. *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971), *cert. denied*, 414 U.S. 874 (1973). The jury was informed of the possible variances in rates of digestion and that death determinations from gastro-intestinal tract studies are subject to six to ten hour variances. This assignment of error is without merit.

[13] Defendant assigns error to testimony, elicited over objection, that the victim was alive when he clutched the grass that was found in his hand. The witness, Dr. Drummond, examined the body at the scene. It was his opinion that "you couldn't reach out and grab a handful of grass the way it was clutched in his hand if you were dead." Defendant argues that the testimony was incompetent because "[t]here is no way in the world, medical doctor or not, that anyone could determine whether Robert Earl Steph-

ens was dead at the time that he had grass in his hand. It does not take medical expertise to know that someone can continue to have muscle spasms and movement after brain death." He contends that "[t]his sequence of testimony was extremely damaging to the defendant from the standpoint of the emotional attitude of the jury."

The testimony was relevant to establish both that the victim was shot at the crime scene, and that the murder was committed with premeditation and deliberation. We hold that Dr. Drummond, based on his experience and expertise in the field of medicine, was qualified to offer his opinion on this question. *See State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979) (holding that implicit in allowing an expert to testify is a finding that the witness was an expert with respect to the subject matter of his testimony).

[14] Dr. Drummond was also permitted to testify that the victim was "lying on the ground with a gun over him pointing down at him" when a graze wound to the victim's head was inflicted. Defendant objected to this testimony and assigns as error the trial judge's failure to sustain the objection. We find no error. Dr. Drummond was properly permitted to offer an opinion as to the position of the victim's body when the wound was inflicted. *State v. Simpson*, 297 N.C. 399, 255 S.E. 2d 147 (1979); *State v. Sparks*, 297 N.C. 314, 255 S.E. 2d 373 (1979).

[15] Defendant also contends that the trial judge erred in allowing Dr. Drummond to testify as to the time of death. The opinion was based upon the doctor's at-the-scene examination of the body and other physical evidence available. The testimony was admissible. *Id. See State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971).

[16] Defendant contends that there was insufficient evidence of premeditation and deliberation to support a charge of first-degree murder. Defendant also argues that the evidence was insufficient to submit the case to the jury on defendant's guilt of any crime. We disagree.

The State's case was built on circumstantial evidence. Premeditation and deliberation may be and is most often proved by circumstantial evidence. *State v. Jones*, 303 N.C. 500, 279 S.E. 2d 835 (1981); *State v. Hill*, 294 N.C. 320, 240 S.E. 2d 794 (1978).

Circumstances giving rise to an inference of premeditation and deliberation include the conduct of defendant before and after the murder, attempts to conceal the body, ill-will between the parties, and whether the killing was done in a brutal and vicious manner. *Id.*

In the present case, defendant was heard to threaten the victim prior to the murder. Following the murder defendant exhibited a callous and smug attitude toward the victim's death. The body was concealed at the side of a deserted dirt path. There had been ill-will between defendant and the victim over the victim's impending court testimony. The victim was shot three times in the head. We find the evidence sufficient to establish the elements of premeditation and deliberation.

We also agree with the State that the evidence supports the submission of and the jury's verdict on the charge of first-degree murder. The standard against which the sufficiency of circumstantial evidence is measured was enunciated in *State v. Jones*, 303 N.C. 500, 279 S.E. 2d 835 (1981). In *Jones*, we noted that the following rule was, in substance, similar to that announced in *Jackson v. Virginia*, 443 U.S. 307, 61 L.Ed. 2d 560 (1979): "[I]n order to survive a motion for nonsuit there must be substantial evidence of all material elements of the offense." *Id.* at 505, 279 S.E. 2d at 838.

> The test of the sufficiency is the same whether the evidence is circumstantial or direct, or both: the evidence is sufficient to withstand a motion to dismiss and to take the case to the jury if there is "evidence [which tends] to prove the fact [or facts] in issue or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture." *State v. Johnson*, 199 N.C. 429, 431, 154 S.E. 730, 731 (1930). If the evidence adduced at trial gives rise to a reasonable inference of guilt, it is for the members of the jury to decide whether the facts shown satisfy them beyond a reasonable doubt of defendant's guilt. *State v. Cutler*, 271 N.C. 379, 156 S.E. 2d 679 (1967).

*Id.* at 504, 279 S.E. 2d at 838.

What constitutes substantial evidence is a question of law for the court. What the evidence proves or fails to prove is a ques-

tion of fact for the jury. A jury can convict only upon proof of guilt beyond a reasonable doubt. *Id.* Thus, before the court can submit a charge of first-degree murder to the jury, there must be substantial evidence of every essential element of the offense charged and that the defendant was the perpetrator of the crime. *State v. Judge*, 308 N.C. 658, 303 S.E. 2d 817 (1983). Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. *Id.* As discussed above, we find substantial evidence that the death of Robert Stephens was the result of a premeditated killing. As our recitation of the evidence discloses, we find substantial evidence that defendant was the perpetrator of the crime. Defendant had both motive and opportunity. The victim's disappearance in a car, later identified as belonging to defendant, together with other facts and circumstances tending to prove that defendant drove the car, and the victim's death a short time later, all point to defendant as Robert Stephens' murderer. This assignment of error is overruled.

[17]  Defendant assigns as error the trial court's instructing the jury on aiding and abetting and acting in concert. We disagree. The evidence tended to show that defendant was involved with Frank Dawson in a case involving forgery and failure to return a rental tool, and that on the night of the victim's disappearance and murder, defendant was accompanied by another man. From this evidence the jury could infer that Dawson was with defendant when the victim was murdered. To insure that the jury would understand that irrespective of who actually shot the victim, defendant would be equally guilty under the theories of acting in concert and aiding and abetting, the trial judge properly instructed the jury on these theories. We find no error.

[18]  Finally, defendant contends that the trial court abused its discretion in denying his motion for appropriate relief based on newly discovered evidence. This assignment of error is without merit.

The "newly discovered evidence" consisted of testimony that a blue and white Monte Carlo was seen in the vicinity of the crime scene approximately three hours before the body was discovered at 6:00 p.m. on 14 June. Following a hearing, the trial court made extensive findings of fact which included, *inter alia*:

(1) That Johnny Washington Best testified that he went to the scene of the—scene where the body was found with Gary Jackson on June 14, 1983 and that he thereafter talked with Officer—with Deputy Sheriff Pearce and he told Deputy Sheriff Pearce at approximately—that at approximately 3:30 p.m. he had seen a blue and white Monte Carlo automobile parked up a path close to where he later saw the body and shortly heard the car come by with a loud muffler type sound, and that he saw in the automobile two black people but could not tell if they were men or women.

(2) That he testified—that Mr. Best testified that he told the defendant's attorney this on Sunday morning after the jury had reached a verdict of guilty of first-degree murder on the preceding Friday, because he felt his evidence was relevant enough to be brought out in court. That the officer, and that the officer did not go back to talk to him.

(3) That Annie Best says that she saw a blue and white car at the end of the path at approximately 3:25 p.m. and her concern was why was more not said about this?

(4) That neither Mr. or Mrs. Best heard any gunshots or saw anything out of the ordinary, I mean unusual.

(5) That Mrs. Best saw whatever she saw while at her drive which is a substantial distance from the path in question and from an angle and at a distance where it would be difficult to see clearly anything in the path.

(6) That Mr. Best testified that he told the officers that all he saw and what he saw and that he, and that the officers took notes. That now Mr. Best says that the two occupants . . . looked to be black, he was unable to tell their sex.

(10) That Deputy Sheriff Pearce then asked Johnny Best if he recalled anyone or any vehicle around that area on Forsyth Street, and the Court finds Johnny Best told Deputy Sheriff Pearce that the only vehicle he recalls was a blue and white Monte Carlo, '73 to '74 model vehicle, which came by the house while he was working and he noticed this because of the loud sound. The Court finds that the witness, Johnny Best, did not mention to Deputy Sheriff Pearce seeing the vehicle in the path as he drove by, but the Court finds that

State v. Pridgen

he first noticed—finds as a fact he first noticed the vehicle as he was working in his yard.

(13) That the officers tried to locate this blue and white Monte Carlo automobile together with a couple of pickup trucks apparently that had been in the area in the last couple of days. That Deputy Sheriff Pearce found no evidence to indicate anyone had been up the path or in the vicinity of the path between midnight of June 13th and 6:00 p.m. on June 14th.

(16) Deputy Sheriff Pearce and the officers, despite their vigorous efforts, find nothing of relevance in any of the rather far-fetched vehicle reports, and under the circumstances their failure to note these fruitless leads was understandable and certainly does not constitute improper conduct of any sort on their behalf.

(23) That all the medical evidence shows that the deceased died around midnight or early in the morning of June 14th. That the Court finds this to be the facts.

(25) That even if the blue and white Monte Carlo was up this path around, at approximately 3:30 p.m. on June 14th, it is only speculative as to what it might have been doing there. There is no valid evidence to suggest any improper purpose on the part of any occupant of the said vehicle.

The trial court concluded that the new evidence was not "material, competent and relevant;" that the officers conducting the investigation did not act improperly in failing to apprise the defendant of the evidence; and that the evidence was not of such a nature that a different result would probably be reached at a new trial. We note further that defense counsel was aware that Best had been interviewed and was present at the scene of the crime. The trial court's findings are supported by the evidence and in turn support the trial court's conclusions. We find no abuse of discretion. *See State v. Stevens,* 305 N.C. 712, 291 S.E. 2d 585 (1982); *State v. Beaver,* 291 N.C. 137, 229 S.E. 2d 179 (1976).

No error.

Justice VAUGHN did not participate in the consideration or decision of this case.