STATE OF NORTH CAROLINA,
v.
DARREN DURRELL DISROE.
No. COA08-1121.
Court of Appeals of North Carolina.
Filed June 2, 2009.
This case not for publication
Attorney General Roy Cooper, by Deputy Director Caroline Farmer, for the State.
Greene & Wilson, P.A., by Thomas Reston Wilson, for defendant-appellant.
STEELMAN, Judge.
Where the State offered substantial evidence to establish every element of identity theft and obtaining property by false pretenses, the trial court did not err by denying defendant's motions to dismiss these charges. Where defendant was afforded an opportunity to present extraordinary family circumstances during his original sentencing hearing, the trial court did not abuse its discretion by failing to reconsider this evidence at the hearing on defendant's motion for appropriate relief.

I. Factual and Procedural Background
In 2005, Darren Disroe (defendant) was employed as an assistant manager of Liberty Tax Service in Garner, North Carolina. At that time, defendant began a business relationship with MiasaKaddoura (Kaddoura) and Namee Barakat (Barakat), who were supervisor and owner, respectively, at both ASK and Raleigh Check Cashing. The parties entered into an agreement where defendant would direct his customers who had received a tax refund to their check cashing services in exchange for a percentage of the profit to be made from the check cashing fee, usually in the amount of one to two percent. At the beginning of each week, defendant would bring a list of clients he had referred to the businesses and Kaddoura would pay him a portion of the profits. This relationship continued until the spring of 2006.
In January 2006, defendant opened up his own business known as D & D Tax Services (D & D) in the back of a hair salon owned by Katrice Jones. D & D applied to the IRS to receive an electronic filing ID number (EFIN) in order to be able to electronically file tax returns directly with the IRS. Once D & D obtained a valid EFIN, defendant offered rapid tax refunds[1] to its customers through its relationship with HSBC bank. Shortly thereafter, Dcentro Wingard (Wingard) became a customer of D & D. On a Tuesday in mid-February 2006, Wingard submitted his tax information to defendant, including his social security number and address. Defendant informed Wingard that his tax refund check for approximately $6,000.00 would be ready to be picked up that Friday. After several weeks and a myriad of excuses from defendant, Wingard finally received his tax refund check in early March. Approximately one month later, Wingard received a telephone call from HSBC bank notifying him that he had an outstanding loan balance. HSBC bank informed Wingard that they had issued two tax refund checks in the amount of $6,118.05 in his name and both had been cashed. Wingard stated that he had neither seen nor endorsed the check that was issued on 8 March 2006 and signed an Affidavit of Unauthorized or Forged Endorsement. Upon receiving this information, HSBC bank initiated a fraud investigation and contacted the Raleigh Police Department.
Meanwhile, Barakat was notified by Wachovia, where ASK and Raleigh Check Cashing had an account and deposited checks received from defendant's tax service, that seven tax refund checks were not honored by HSBC bank. Barakat knew the returned checks had been issued by D & D based upon a unique seventeen digit office structure number[2] located under the name of the payee. Both Barakat and Kaddoura confronted defendant about the returned checks and subsequently called the police. On 5 February 2007, defendant was indicted for identity theft as to Wingard and obtaining property by false pretenses from ASK Check Cashing and HSBC bank.[3] On 13 March 2008, the jury found defendant guilty of these charges. The trial court determined defendant to be a prior record level II for felony sentencing purposes. Defendant was sentenced to an active term of twelve to fifteen months on the identity theft conviction, and a consecutive term of six to eight months on the obtaining property by false pretenses conviction. The second judgment was suspended for twenty months and defendant was required, as a condition of probation, to pay restitution in the amount of $6,118.05.
On 24 March 2008, defendant filed a motion for appropriate relief alleging that there was an error in the computation of his prior record level and that defendant had extraordinary family circumstances that were not fully presented to the trial court at sentencing. A hearing was conducted, and the trial court struck its previous judgments based on the fact that defendant's conviction for third degree assault, a class C misdemeanor in Missouri, did not qualify as a prior conviction for felony structured sentencing. The trial court also ruled that defendant was not entitled to any additional hearing on the asserted claim of "extraordinary family circumstances." Defendant was resentenced as a prior record level I to an active prison term of ten to twelve months for the identity theft conviction and five to six months, suspended for the obtaining property by false pretenses conviction. Defendant appeals.

II. Motions to Dismiss
In his first argument, defendant contends the trial court erred by failing to dismiss the charges of identity theft and obtaining property by false pretenses based upon insufficient evidence to support each element of these offenses. We disagree.

A. Standard of Review
"Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." State v. Powell, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980) (citations omitted). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." State v. Smith, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980) (citations omitted).
The test of the sufficiency of the evidence to withstand the motion is the same whether the evidence is direct, circumstantial or both. "When the motion . . . calls into question the sufficiency of circumstantial evidence, the question for the Court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty." In passing on the motion, evidence favorable to the State is to be considered as a whole in order to determine its sufficiency. This is especially true when the evidence is circumstantial since one bit of such evidence will rarely point to a defendant's guilt. Powell, 299 N.C. at 99, 261 S.E.2d at 117-18 (internal citations omitted) (emphasis added).
It is well-settled that "[c]ourts may resort to circumstantial evidence of motive, opportunity, capability and identity to identify the accused as the perpetrator of the crime." State v. Stone, 323 N.C. 447, 452, 373 S.E.2d 430, 434 (1988) (citing State v. Pridgen, 313 N.C. 80, 326 S.E.2d 618 (1985)). However, if the evidence at trial only raises a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion to dismiss should be allowed. Powell, 299 N.C. at 98, 261 S.E.2d at 117. We must view the evidence "in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn [therefrom]. Contradictions and discrepancies must be resolved in favor of the State, and the defendant's evidence, unless favorable to the State, is not to be taken into consideration." State v. Bullard, 312 N.C. 129, 160, 322 S.E.2d 370, 387-88 (1984) (internal citations omitted).

B. Identity Theft
Identity theft occurs when:
A person . . . knowingly obtains, possesses, or uses identifying information of another person, living or dead, with the intent to fraudulently represent that the person is the other person for the purposes of making financial or credit transactions in the other person's name, to obtain anything of value, benefit, or advantage, or for the purpose of avoiding legal consequences . . . . N.C. Gen. Stat. § 14-113.20(a) (2007). "[I]dentifying information" includes a person's social security number or employer taxpayer identification number. N.C. Gen. Stat. § 14-113.20(b) (2007).
At trial, the State's evidence tended to show that in mid-February of 2006, Wingard met defendant at the hair salon and entered a small room containing one computer and several file cabinets. Wingard and defendant were the only two persons present in the office area. Wingard submitted all of his personal tax information directly to defendant, including his social security number and address. Wingard did not submit this information to anyone other than defendant. When Wingard did not receive his tax refund check on the date promised and several weeks had passed, he called the IRS to inquire into the status of his return. At that time, the IRS told Wingard that his tax refund had already been paid. Subsequently, Wingard received a tax refund check from defendant in the amount of $6,118.05. However, the loan authorization code given to D & D for Wingard was used twice to generate two tax refund checks in the same amount. When Wingard learned that two tax refund checks had been issued and cashed, he immediately asserted that one of the checks was fraudulent and executed an affidavit.
The EFIN on the unauthorized tax refund check was the one issued to D & D. Although the EFIN was actually registered in the name of one of the employees of the hair salon on behalf of D & D, defendant's own testimony established that he was the only person to complete the required compliance training for the software that provided rapid tax refunds. Compliance training consisted of an explanation of "how to fill out the application, the disclosures and to offer [HSBC bank's] products." Yvette Singletary, a receptionist for the hair salon, testified that there was a lock on the door where defendant would prepare client's taxes and that no other salon employee was allowed access. Both Kaddoura and Barakat also testified that defendant was the only person in the salon that was involved in the tax preparation business. Although defendant presented evidence that tended to show other persons may have had access to his computer and could have printed out the unauthorized tax refund check, this evidence was "not to be taken into consideration" by the trial court during his motion to dismiss. Bullard, 312 N.C. at 160, 322 S.E.2d at 388; see also Powell, 299 N.C. at 99, 261 S.E.2d at 117 ("[C]ontradictions and discrepancies are for the jury to resolve and do not warrant dismissal[.]").
Viewing the preceding evidence in the light most favorable to the State, we hold it is sufficient to support a reasonable inference that defendant knowingly used Wingard's personal tax information to fraudulently obtain an unauthorized tax refund check in Wingard's name. The trial court properly denied defendant's motion to dismiss the identity theft charge and submitted this issue to the jury.

C. Obtaining Property by False Pretenses
N.C. Gen. Stat. § 14-100 (2007) defines obtaining property by false pretenses as:
knowingly and designedly by means of any kind of false pretense whatsoever, whether the false pretense is of a past or subsisting fact or of a future fulfillment or event, obtain or attempt to obtain from any person within this State any money, goods, property, services, chose in action, or other thing of value with intent to cheat or defraud any person of such money, goods, property, services, chose in action or other thing of value . . . .
In the instant case, the State's indictment for this offense alleged:
[O]n or about May 3 through May 17, 2006, . . . defendant . . . unlawfully willfully and feloniously did knowingly and designedly with the intent to cheat and defraud obtain and attempt to obtain $6,118.05 from ASK Check Cashing and HSBC Bank, USA by means of a false pretense which was calculated to deceive and did deceive in violation of N.C.G.S. . 14-100.
The false pretense consisted of the following: The defendant had prepared income taxes for Dcentro Wingard and applied for a rapid refund anticipatory loan from HSBC Bank for Dcentro Wingard. A loan authorization code was issued for the rapid refund check payable to Mr. Wingard in the amount of $6,118.05. A legitimate check was then printed and given to Mr. Wingard. A second, unauthorized check, written for the same amount was printed using the same loan authorization code. The defendant took this check and cashed it at ASK Check Cashing as if the check was legitimately issued by HSBC Bank, which was false and he knew to be false.
Defendant's argument at trial and on appeal is that the State presented insufficient evidence to establish defendant was the perpetrator who cashed Wingard's unauthorized tax refund check at ASK Check Cashing. We disagree. In addition to the previously mentioned evidence, Kaddoura and Barakat both testified on behalf of the State regarding the business relationship that existed between the check cashing services and defendant from 2005 until 2006. Kaddoura testified that usually defendant would call her to inform her of the amount of the tax refund check to be cashed by one of his clients. She would then bring that amount of money to defendant in exchange for the client's endorsed tax refund check. If Kaddoura was unable to leave the business, defendant would travel to her location to retrieve the cash. Kaddoura would then make a notation on the check defendant had brought to her by placing a D on it. Barakat testified that either he, Kaddoura, or Abdul would meet with defendant depending on who was available when he called. He also testified that when Kaddoura cashed a tax refund check for defendant she would place a D on each check. Barakat never interacted with anyone else at the salon besides defendant when making these transactions.
At trial, the State entered into evidence the seven tax refund checks that were not honored by HSBC bank as exhibits 13 through 19. Each check has D & D's office structure number located under the name of the payee and was returned based upon there being no account in the payee's name on file with HSBC bank. Exhibits 13-18 have a D placed in the center of the check. Exhibit 19 did not have this notation. At trial, Kaddoura testified that there was no notation on that particular check because she was not the employee who cashed it. However, Kaddoura knew the check was from defendant based upon the office structure number.
A copy of the unauthorized tax refund check issued in Wingard's name is marked as State's exhibit 1. Although there is no D placed on this check, D & D's EFIN is listed under Wingard's name and the check was deposited into a Wachovia account, which belonged to Barakat and his two cash checking services.
Defendant asserted that Wingard's legitimate tax refund check was printed on 26 April 2006. In an attempt to prove he did not issue the unauthorized check in Wingard's name, defendant contended he was not even in the State at that time, but was vacationing with his wife in Atlanta. However, Wingard testified that he received a legitimate tax refund check in early March 2006. Prior to that time, the IRS had told Wingard that his tax refund had already been paid. The unauthorized tax refund check was printed on 8 March 2006, deposited on 12 March 2006, and cleared HSBC bank's processing center on 13 March 2006. The legitimate tax refund check cleared HSBC bank's processing center on 15 March 2006. Nowhere in defendant's testimony does he assert that he was out-of-town during this period of time.
Viewing this circumstantial evidence in the light most favorable to the State, we hold it is sufficient to support a reasonable inference that defendant was the perpetrator who cashed Wingard's unauthorized tax refund check in the amount of $6,118.05. Stone, 323 N.C. at 452, 373 S.E.2d at 434. Defendant further argues that there was no evidence presented at trial that indicated the unauthorized check was cashed at ASK Cash Checking as alleged in the indictment. Although Barakat testified that there was nothing on the returned checks to indicate whether they had been cashed at either ASK or Raleigh Cash Checking, Barakat's two businesses, he testified that he deposited checks from both businesses into a single Wachovia bank account. The unauthorized tax refund check issued in Wingard's name shows that it was deposited into Barakat's Wachovia account. Barakat further testified that in August 2006, Wachovia returned the unauthorized check to him because "the bank found out [the] check[] [was] no good[.]" We hold this evidence was sufficient to establish the unauthorized check was cashed at ASK Cash Checking. The trial court properly denied defendant's motion to dismiss the obtaining property by false pretenses charge.
These assignments of error are without merit.

III. Motion for Appropriate Relief
In his second argument, defendant contends the trial court abused its discretion by failing to consider defendant's evidence of extraordinary family circumstances during the hearing on his motion for appropriate relief. We disagree.
Disposition of post-trial motions pursuant to N.C. Gen. Stat. § 15A-1414 and -1415 are within the discretion of the trial court and the refusal to grant them is not error absent a showing of an abuse of that discretion. State v. Watkins, 45 N.C. App. 661, 665,263 S.E.2d 846, 849, disc. review denied, 300 N.C. 561, 270 S.E.2d 115 (1980).
In the instant case, defendant filed a motion for appropriate relief alleging, inter alia, "he has some extraordinary family circumstances, that were not fully presented to the Court at sentencing, and he verily believes that had the Court been made fully aware of his circumstances, the Court may have imposed an other than active sentence." Defendant listed eleven circumstances, including that he was self-employed and the primary source of financial support for his family, he had a blended family with nine children, including triplets, and two of the children suffered from asthma.
At defendant's original sentencing hearing the following colloquy took place between the trial court and defense counsel:
The Court: All right. Is the defense prepared to go forward at this sentencing hearing?
[Defense Counsel]: We are, your Honor.
The Court: You may proceed.
[Defense Counsel]: I will have you know [defendant] is 37. He will be 38 in April, your Honor. He [is] the father of nine children. He got married three years ago. He came with a set of triplets and one other child. His wife had her own children and they blended in.
Your Honor, nine children in his household. He is self-employed. He is military, former IRS employee. Has some college, and you can see from his record, your Honor, there is no history of theft or theft like conduct.
I believe we are dealing with a Class G and I believe that's an IA block, your Honor.I think most appropriate would be an intermediate sanction. . . . Nothing further, your Honor.
Defendant then asked the trial court for leniency in order to give him a chance to continue to provide for his family. Defendant's contention that the trial court was not fully aware of his family circumstances is without merit. The trial court did not abuse its discretion by failing to reconsider evidence of extraordinary circumstances, where defendant was afforded an opportunity to present this evidence and, in fact, did present this evidence during his original sentencing hearing.
Defendant's remaining assignment of error was not argued in his brief and is therefore deemed abandoned. N.C.R. App. P. 28(b)(6) (2008).
NO ERROR.
Judges BRYANT and ELMORE concur.
Report per Rule 30(e).
NOTES
[1] The rapid tax refund is essentially an anticipatory loan from a bank on an expected tax return owed to a person from the federal government. In order to provide this service, a tax preparer must obtain a valid EFIN from the IRS, purchase certain software from a bank that offers electronic filings, and complete compliance training. Once the tax preparer complies with these prerequisites, he may utilize the service as follows: a customer will submit their tax forms to the tax preparer, who would in turn, process the information and send it to the bank through their software. The bank reviews the information and verifies that the IRS has received a tax return for that person. The bank may also choose to screen the customer's credit scores before authorization of the loan. Once the loan is approved, the tax preparer is notified and prints a check in the amount estimated to be returned by the federal government minus the bank and tax preparation fees. The payment is then sent directly from the IRS to the bank and applied to pay the loan.
[2] The office structure number contains the EFIN, print center, and office number.
[3] Defendant was also charged and tried for several other criminal offenses, including felonious possession of stolen goods, two additional charges of obtaining property by false pretenses, one additional charge of identity theft, and trafficking in counterfeit instruments. However, these charges were either dismissed or the jury returned not guilty verdicts.