HUNTER, JR., Robert N., Judge.
 

 *512
 
 Jujuan Maquis Cox ("Defendant") appeals from a 21 October 2015 judgment entered after a jury convicted him of first-degree murder, second-degree murder, attempted first-degree murder, two counts of assault with a deadly weapon with intent to kill, and five counts of discharging a weapon into occupied property. Defendant argues the trial court erred by: (1) failing to dismiss the first-degree murder charge on the theory of lying in wait; (2) failing to dismiss the charge of second-degree murder; (3) failing to dismiss the charge of assault with a deadly weapon with the intent to kill inflicting serious injury ("AWDWIKISI"); and (4) giving a coercive jury instruction after the jury repeatedly stated it was deadlocked. Defendant also argues ineffective assistance of counsel. We find the court committed no error on the issues raised on appeal and dismiss Defendant's claim of ineffective assistance of counsel without prejudice to refile the claim in a Motion for Appropriate Relief.
 

 I. Procedural and Factual Background
 

 On 5 August 2013, a grand jury indicted Defendant on multiple counts of first-degree murder, attempted first-degree murder,
 
 *513
 
 AWDWIKISI, discharging a firearm into an occupied dwelling, and two counts of discharging a firearm into an occupied vehicle. The State tried Defendant on the following: two charges of first-degree murder, two charges of attempted first-degree murder, two charges of AWDWIKISI, three charges of discharging a firearm into an occupied dwelling, and two charges of discharging a firearm into an occupied vehicle in operation.
 

 On 12 October 2015, the trial court called Defendant's case for trial. The State's evidence tended to show the following. The State first called Aaron Michael Cantwell ("Cantwell") with the Wayne County Sheriff's Office. While on duty on 2 December 2012, Cantwell received a "shots fired" call over the radio as he was driving. Upon arrival at the scene, Cantwell saw another officer's patrol car approach. Cantwell then spoke to a man walking on a path crossing Mt. Olive Road, when he heard a female voice crying for help. The two officers approached the screaming woman, who directed them to a trailer. Cantwell entered the trailer through its back door, and heard a "painful holler."
 

 Advancing into the trailer, Cantwell saw three victims lying on the floor. The first man Cantwell saw was shot and immobile. The second man, later identified as Trae Stokes ("Stokes"), was also shot, but was "coherent and yelling." Cantwell noticed a .40 caliber Glock handgun under some clothing between the unconscious individual and Stokes. Cantwell instructed the other officer to keep people from entering the trailer. Cantwell then "secured" the weapon by locking it in the trunk of his car, and called EMS. Upon arrival, EMS initially treated Stokes in the trailer's kitchen. EMS then "removed and transported [Stokes] to Wayne Memorial Hospital." While EMS treated Stokes, Cantwell checked the other two individuals for signs of life.
 

 The State next called Stokes. Stokes and the victim, Jamal Anthony Kornegay ("Kornegay"), had a fifteen year-long friendship. Stokes also knew the other victims Leonard Darden ("Darden") and Nakiea Felicia Garner ("Garner"). Stokes recognized Defendant in the courtroom, and stated they attended school together their entire lives. Stokes was "absolutely" familiar with Defendant's voice.
 

 On 2 December 2012, Stokes drove to Kornegay's trailer. Upon entering the trailer, Stokes saw Kornegay, Garner, and Darden sitting around the kitchen table. Stokes saw Defendant drive his van outside Kornegay's trailer.
 

 At this point, Kornegay went outside. Kornegay returned within 10 seconds and stated, "Juan outside on that bullshit." Stokes knew Kornegay referred to Defendant. Stokes then heard Defendant yell from
 
 *514
 
 outside, "tell your bitch ass home boy [Darden] to come outside." About three seconds later, Stokes heard gun shots and ran into another room. "After that it was just multiple shots came [sic] through the trailer."
 

 Stokes knew the shots went through the trailer, "[b]ecause you could see the debris as
 
 *342
 
 they hit." Stokes stated Kornegay and Garner stayed in the kitchen, on the floor:
 

 As I heard shots I'm laying in this doorway, like laying in the doorway. As I heard shots I peeked out, and I see that [Kornegay] has a pool of blood up under his chest because he's face-down, but he has a pool of blood so I'm trying to see where he's shot. As I'm sliding out, [Garner] raise her head up, and I seen that she had got shot ... I slid across the floor like right here. I got in between both of them trying to assess their wounds.
 

 As Stokes slid across the room towards Kornegay and Garner, Stokes received a shot in his leg. After Stokes was shot, he heard more shots. He remained still until the police arrived.
 

 The shots subsided, and Darden exited a different room. Stokes told Darden to leave and to call an ambulance. Stokes "[saw Darden] go out the back door," and he "heard his car leave." Once Darden "got about to the top of the path pulling out on to the highway[,]" Stokes heard more shots. Stokes saw Kornegay's handgun and took it in case someone entered the trailer.
 

 At this point, Stokes saw Thompson enter the trailer. Stokes told Thompson to call an ambulance. Thompson left and the police arrived shortly thereafter.
 

 Stokes admitted he lied to the Sheriff's deputies when they interviewed him in the hospital. Stokes told members of the Sheriff's Department he did not recognize Defendant's voice, when he actually did. Stokes felt "the police that we have in Wayne County, they don't really do their job on murders, so I would much rather handle it myself."
 

 The State next called Darden. Darden knew Defendant, Kornegay, and Garner for ten years. Darden also knew Stokes and Thompson. According to Darden, Kornegay lived alone and possessed a .40 caliber Glock handgun. On 2 December 2012, Darden visited Kornegay at Kornegay's trailer. Stokes and Garner arrived later. Kornegay received a phone call from Thompson and went outside for about three to five minutes. Kornegay then came back inside and said, "[Defendant] outside on that bullshit." As Darden stood in the hallway with Kornegay, he
 
 *515
 
 heard approximately ten gunshots. More gunshots continued for fifteen minutes. Kornegay walked past a window to check on Garner, and he received a shot in the head. Garner received a shot in her head as she jumped to grab Kornegay.
 

 Darden went to Kornegay, and noticed his faint breath. Darden also noticed Stokes's leg wound. After the shooting stopped, Darden ran out the back door and jumped into his vehicle. Defendant stood by the trailer's driveway with an assault rifle. Darden drove down the path toward Old Mt. Olive Highway, and Defendant shot at Darden's vehicle. Darden saw police lights at the highway. Darden then pulled up in front of the police, and told them Defendant shot him in the arm.
 

 Thompson testified next for the State. Thompson and Defendant knew each other all their lives. Thompson visited Kornegay the evening of the shooting. Initially, Thompson remained in his car, and saw Defendant's van. He also saw Defendant exit the van while holding a rifle. Thompson yelled for Kornegay to come outside and also called out Defendant had a rifle. Thompson heard Defendant yell, "tell your pussy ass home boy[Darden] to come outside." Thompson testified as he left Kornegay's trailer:
 

 I back up, I go back where [Defendant] was, and ah-I tell him, I said man, you need to leave before you do something you regret tonight. He said whatever, whatever I do tonight I make bond off tomorrow; so I pull up a little bit, a few feet, I stop because I get a feeling like, yo, I roll the window down, I said Jujuan Cox, you better not shoot in my car when I drive off. He says to me Antonio Thompson, I don't have no problems with you; I got a problem with your cousin. So I drives off. I get to the end of the path. When I get on the highway I hear gunshots, so I start calling [Kornegay's] phone and he won't pick up.
 

 Thompson then phoned Stokes. Stokes told Thompson everyone in the house was shot. Thompson travelled back toward Kornegay's trailer. On his way, Thompson saw the police stop at the trailer. The police talked to an unknown man by Defendant's van. Thompson
 
 *343
 
 returned and entered the trailer before the police arrived. Thompson saw everyone was shot. Only Stokes was alive, but he suffered a shot in his leg. Thompson then heard several more gunshots.
 

 The State rested. At the close of the State's evidence, Defendant moved to dismiss the two first-degree murder charges, the attempted first-degree murder charges, the assault with a deadly weapon with
 
 *516
 
 intent to kill, and the shooting into an occupied dwelling and an occupied vehicle. Defendant's trial counsel specifically argued "there's been not one scintilla of evidence that the [D]efendant, with malice aforethought, which is intent to kill or premeditation or deliberation has been presented in this case concerning either Jamal Anthony Kornegay or Neekea Felicia Garner." Defendant's counsel further argued, "there's been no evidence whatsoever presented in this courtroom by anyone that the [D]efendant unlawfully, willfully and feloniously and of malice aforethought, which again is intent to kill with premeditation and deliberation, attempted to kill or murder Trey Stokes." In response, the State argued, "looking at the evidence in the light most favorable to the State ... [the evidence sufficiently] shows an intent to kill." The trial court denied Defendant's motions.
 

 Counsel for the defense presented an alibi witness, Maurice Whitehead ("Whitehead"). Whitehead was friends with Defendant's aunt, Dorothy Cox ("Cox"). Whitehead recalled at the time of the shooting, Defendant was with him at Cox's house watching a football game. However, Whitehead also recalled Defendant leaving with his van sometime after 10:00 p.m.
 

 At the close of all the evidence, Defendant renewed his motions to dismiss the charge of first-degree murder of Kornegay, the charge of first-degree murder of Garner, and the charge of assault with a deadly weapon with intent to kill inflicting serious injury of Stokes. Defense counsel argued, "there is not one scintilla of evidence that's been offered that the Defendant fired any shots killing anybody." The trial court denied both Defendant's motions.
 

 During the charge conference, defense counsel objected to the jury instruction of acting in concert. The trial court allowed the instruction to go to the jury. Defendant's counsel also objected to the trial court's instructing the jury on three different theories of murder. The State responded, "the State's not required to pick a theory. We contend the evidence is there for all three of these [theories]." The trial court noted for the record Defendant did not object to the State proceeding on the felony murder rule. However, the trial court noted Defendant's objection to the case proceeding on the theories of premeditation and deliberation and lying in wait. In its discretion, the trial court allowed instructions on all three murder theories to go to the jury. Defendant did not object to the jury instruction for AWDWIKISI.
 

 The jury began to deliberate at 10:57 a.m. About an hour and a half later, the jury submitted a note to the trial court stating "We cannot come
 
 *517
 
 to a unanimous decision on any of the charges against [Defendant]." The trial court said to counsel, "I'll hear from you at this time as to how we can proceed." The State responded, "at some point we need to give the
 
 Allen
 
 charge[.]" Defense counsel agreed.
 

 After lunch, the trial court gave the jury an
 
 Allen
 
 charge:
 

 Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, it if can be done without violence to individual judgment. Each juror must decide the case for himself or herself, as the case may be, but only after impartial consideration of the evidence with his fellow jurors-his or her fellow jurors. In the course of deliberations a jury should not hesitate to re-examine his or her own views and change his opinion if convinced it is erroneous, and no juror should surrender his or her honest conviction as to the weight or effect of evidence solely because of the opinion of his or her fellow jurors, or for the mere purpose of returning a verdict. I'm going to ask that you go back in and continue your deliberations.
 

 At 2:22 p.m., the jury requested copies of Darden's, Stokes's, Thompson's and Whitfield's transcripts. The trial court denied the
 
 *344
 
 request and instructed the jury to rely on its recollection. Defense counsel did not object. At 2:55 p.m., the jury sent the trial court a note stating, "After several attempts to resolve the issues the dissenting jurors have ... it is impossible for the jurors to agree with the majority of the jurors." The trial court stated:
 

 What I would propose is that we-I read those instructions again, jurors have a duty to consult with one another, to deliberate with a view toward ... with a view to reaching an agreement if it can be done without violence to individual judgment. Each juror must decide the case for him or herself, but only after an impartial consideration of the evidence with his or her fellow jurors. ...
 

 Defense did not object, but stated:
 

 Just, your Honor, the only thing that kind of concerned me was telling them that they needed to try to reach a verdict, and then I just-I, I mean if they can't they can't, you know. I don't know. That would be the only issue; everything else was fine.
 

 *518
 
 At 3:43 p.m., the trial court received a third note from the jury stating, "[W]e cannot come to a same verdict. Neither side is going to agree. The jurors are still firm to their decision." The jury had been deliberating for less than 5 hours at this point, and the trial court stated "I am, at this time, not prepared, in my discretion, to declare a mistrial." The trial court gave the following instructions:
 

 I'm going to send you back with those same instructions that I've given you earlier. And while you are back there, you decide whether you all want to work after 5:00 or end at 5:00 and come back tomorrow. You take a vote and let us know. But after 5 days of testimony and less than 5 hours of deliberations, these folks deserve better.
 

 Defense counsel did not object. The jury decided to continue deliberations after a recess. The trial court arranged to have a meal delivered to the jury.
 

 At 6:10 p.m., the jury reached a verdict, finding Defendant guilty of the following: (1) first-degree murder of Kornegay on the theory of lying in wait; (2) second-degree murder of Garner; (3) attempted first-degree murder of Darden; (4) two counts of assault with a deadly weapon with intent to kill inflicting serious injury of Darden and Stokes; (5) three counts of discharging a weapon into occupied property; and (6) two counts of discharging a firearm into an occupied vehicle.
 

 As to the first-degree murder of Kornegay, the trial court sentenced Defendant to life without parole. As to the second-degree murder of Garner, the trial court sentenced Defendant to a minimum of 276 months and a maximum of 344 months, to run at the expiration of Defendant's sentence of life without parole. The trial court consolidated the rest of the judgments into the attempted first-degree murder of Darden. For that charge, the trial court sentenced Defendant to a minimum of 180 months and a maximum of 228 months, to run at the expiration of the second-degree murder sentence. Defendant then orally gave notice of appeal.
 

 On 29 January 2016, Defendant, through trial counsel, filed a motion for appropriate relief in Wayne County Superior Court. The trial court heard the motion on 6 April 2016. In the motion, Defendant contended Defendant's counsel learned juror Number 4 approached Defendant's family in the parking lot after the verdict. Juror Number 4 was crying and told Defendant's family the "Judge forced [the jury] to make a guilty verdict." Upon receiving this information, defense counsel contacted a private investigator to investigate this issue. Juror Number 4 told the
 
 *519
 
 private investigator "the judge did enter the jury room before deliberations were met." Another juror also "stated the judge did enter the jury room before the jury deliberated and [that juror] felt pressured to find [Defendant] guilty." Based on these assertions, Defendant's counsel requested the trial court to hold an evidentiary hearing.
 

 The trial court responded, "Well, under State statute a juror is not competent to testify as to what goes on in the jury room." Therefore, the trial court denied Defendant's motion and Defendant's request for an evidentiary hearing. On that same day, the trial
 
 *345
 
 court issued a written order denying Defendant's motion and finding:
 

 1. The Motion consists only of general and conclusory allegations and fails to state sufficient grounds in its support.
 

 2. The Defendant has failed to allege any underlying set of facts or develop any factual basis supported by affidavit or documentary evidence which might show a substantial denial of constitutional rights.
 

 3. The Motion does not meet the criteria of Article 88 of Chapter 15A of the North Carolina General Statutes; neither does it adequately state a basis in law or fact for the relief requested.
 

 Also on that same day, Defendant, through trial counsel, appealed the trial court's decision in open court.
 

 On 10 July 2017, Defendant filed with this Court a "Motion to Withdraw Appeal Taken on 6 April 2016 and to Vacate Order on Motion for Appropriate Relief For Lack of Jurisdiction." In this motion, Defendant's appellate counsel states:
 

 4. After knowing discussions between [Defendant] and undersigned counsel, [Defendant] has elected to dismiss his 6 April 2016 appeal regarding his motion for appropriate relief. [Defendant] has been made aware that the decision to pursue or dismiss the 6 April 2016 appeal is his decision alone and that by dismissing the 6 April 2016 appeal, he loses his only opportunity to pursue it.
 

 ....
 

 6. [Defendant] also moves to vacate the trial court's order on his motion for appropriate relief because the trial court lacked jurisdiction to hear the motion.
 

 *520
 

 ....
 

 11. Because [Defendant] filed his motion for appropriate relief in the trial court after the trial court had been divested of jurisdiction, the trial court lacked jurisdiction to consider his motion[.]
 

 This Court allows Defendant's motion to dismiss his motion for appropriate relief and vacates the trial court's order on the motion due to lack of jurisdiction.
 

 II. Standard of Review
 

 This Court "reviews the denial of a motion to dismiss for insufficient evidence
 
 de novo
 
 ."
 
 State v. Taylor
 
 ,
 
 203 N.C. App. 448
 
 , 458,
 
 691 S.E.2d 755
 
 , 763 (2010) (citation and quotation marks omitted),
 
 cert. dismissed
 
 ,
 
 366 N.C. 408
 
 ,
 
 736 S.E.2d 180
 
 (2012) (quoting
 
 State v. Robledo
 
 ,
 
 193 N.C. App. 521
 
 , 525,
 
 668 S.E.2d 91
 
 , 94 (2008) ). Under a
 
 de novo
 
 review, this Court "considers the matter anew and freely substitutes its own judgment for that of the trial court."
 
 State v. Sanders
 
 ,
 
 208 N.C. App. 142
 
 , 144,
 
 701 S.E.2d 380
 
 , 382 (2010). "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied."
 
 State v. Barnes
 
 ,
 
 334 N.C. 67
 
 , 75,
 
 430 S.E.2d 914
 
 , 918 (1993) (quoting
 
 State v. Powell
 
 ,
 
 299 N.C. 95
 
 ,
 
 261 S.E.2d 114
 
 (1980) ).
 

 "Under plain error review, a defendant must demonstrate that the trial court committed 'a fundamental error.' "
 
 State v. May
 
 ,
 
 368 N.C. 112
 
 , 119,
 
 772 S.E.2d 458
 
 , 463 (2015). Plain error arises when the error is " 'so basic, so prejudicial, so lacking in its elements that justice cannot have been done[.]' "
 
 State v. Odom
 
 ,
 
 307 N.C. 655
 
 , 660,
 
 300 S.E.2d 375
 
 , 378 (1983) (quoting
 
 United States v. McCaskill
 
 ,
 
 676 F.2d 995
 
 , 1002 (4
 
 th
 
 Cir. 1982) ). "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result."
 
 State v. Jordan
 
 ,
 
 333 N.C. 431
 
 , 440,
 
 426 S.E.2d 692
 
 , 697 (1993).
 

 III. Analysis
 

 A. First-degree Murder
 

 Defendant first contends the trial court erred in denying his motion to dismiss the first-degree murder charge on the theory of lying
 
 *521
 
 in wait.
 
 [1]
 
 Defendant bases this contention
 
 *346
 
 on the ground there was no ambush because Defendant announced his presence. We disagree.
 

 Murder perpetrated by lying in wait "refers to a killing where the assassin has stationed himself or is lying in ambush for a private attack upon his victim." The assassin need not be concealed, nor need the victim be unaware of his presence. "If one places himself in a position to make a private attack upon his victim and assails him at a time when the victim does not know of the assassin's presence or, if he does know, is not aware of his purpose to kill him, the killing would constitute a murder perpetrated by lying in wait."
 

 State v. Leroux,
 

 326 N.C. 368
 
 , 375,
 
 390 S.E.2d 314
 
 , 320 (1990) (internal citations omitted). "Even a moment's deliberate pause before killing one unaware of the impending assault and consequently 'without opportunity to defend himself' satisfies the definition of murder perpetrated by lying in wait."
 
 State v. Brown
 
 ,
 
 320 N.C. 179
 
 , 190,
 
 358 S.E.2d 1
 
 , 10,
 
 cert. denied
 
 ,
 
 484 U.S. 970
 
 ,
 
 108 S.Ct. 467
 
 ,
 
 98 L.Ed. 2d 406
 
 (1987).
 

 Our State Supreme Court has held, under the theory of lying in wait, a defendant does not need to be concealed.
 
 See
 

 Brown,
 

 320 N.C. at 190
 
 ,
 
 358 S.E.2d at 10
 
 . Also, a victim does not need to be aware of a defendant's intent to kill under the theory of lying in wait.
 
 Id
 
 . at 190,
 
 358 S.E.2d at 10
 
 .
 
 See also
 

 State v. Allison
 
 ,
 
 298 N.C. 135
 
 , 148,
 
 257 S.E.2d 417
 
 , 425 (1979) (holding a conviction was proper under the theory of lying in wait when the defendant waited for the victim behind the tree, then called her over and killed her).
 

 Here there was substantial evidence, taken in the light most favorable to the State, to support the submission of the lying in wait theory of first-degree murder. The State's evidence tended to show the victim, Kornegay, was in his residence with his friends at the time of the murders. Defendant arrived at Kornegay's residence after dark, and Kornegay went outside to talk with him. There is no evidence Defendant threatened or directed harm at Kornegay at this time. Kornegay returned to
 
 *522
 
 his trailer, unharmed, after speaking with Defendant. Defendant waited for Kornegay to go back inside, and then Defendant proceeded to fire his weapon into Kornegay's trailer, killing Kornegay.
 

 The State's evidence also tended to show Kornegay had no warning Defendant intended him any harm. When Defendant talked to Kornegay, he told Kornegay to send Darden outside. At this point, Defendant indicated to Kornegay he only had an issue with Darden. Therefore, Kornegay was taken by complete surprise, and had no opportunity to defend himself. We therefore conclude the trial court did not err in submitting first-degree murder on the theory of lying in wait to the jury.
 

 B. Second-degree Murder
 

 Defendant next contends the trial court erred in denying defense counsel's motion to dismiss the charge of second-degree murder of Garner. We conclude Defendant failed to preserve this issue for appellate review.
 

 Rule 10(a) of the North Carolina Rules of Appellate Procedure states, "[i]n order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1) (2017). Additionally, Rule 10(a)(3) provides "[i]n a criminal case, a defendant may not make insufficiency of the evidence to prove the crime charged the basis of an issue presented on appeal unless a motion to dismiss the action, or for judgment as in case of nonsuit, is made at trial." N.C. R. App. P. 10(a)(3) (2017).
 

 At the close of the State's evidence, Defendant made a motion to dismiss each count of first-degree murder as to the victims Kornegay and Garner. Defense counsel explained:
 

 First off there's been not one scintilla of evidence that the defendant, with malice aforethought, which is intent to kill or
 
 *347
 
 premeditation or deliberation has been presented in this case concerning either Jamal Anthony Kornegay or Neekea Felicia Garner. The only evidence that the State has produced is that Mr. Darden, Leonard Darden, goes by Al, Driver stated in his sworn testimony here in the courtroom that [Defendant] was across the path from a trailer shooting at him when he was leaving the scene.
 

 ....
 

 *523
 
 And that definitely doesn't show that the defendant in regards to Jamal Anthony Kornegay or Neekea Felicia Garner at any time unlawfully, willfully, feloniously and malice aforethought did kill and murder either one of these two people.
 

 There is no direct evidence to that and we would be asking the Court to strongly consider a motion to dismiss both counts of first degree murder. I understand the State's proceeding under the felony murder rule I guess. That would be my idea of it, but still you have to show or have to have malice aforethought, intent to kill, premeditation or deliberation as to Jamal Anthony Kornegay and as to Neekea Felicia Garner. There is no evidence of that been presented in this courtroom in this case.
 

 ....
 

 That would be my arguments as to the two murder counts.
 

 The trial court denied Defendant's motions to dismiss.
 

 At the close of all the evidence, defense counsel argued:
 

 The only testimony that you have is Mr. Darden said he shot at his vehicle when he went that way and that the Defendant was across the path with a chopper. And, again, that doesn't really add up either, because if he was facing him the shots wouldn't have been in the rear of the vehicle; but that's the testimony, that's the evidence that's been presented in this case; and it does not add up to first degree murder of ... Nakiea Felicia Garner or Jamal Anthony Kornegay.
 

 And, again, the motion would be the same motion as to the charge of first degree murder against the decedent Nakiea Felicia Garner, ... for the exact same reasons; there is no evidence that this man, the Defendant, ever fired a weapon at that trailer by anybody.
 

 Again, Mr. Darden stated he shot at his vehicle from across the path. That's the evidence. And, again, I would ask the Court to consider motions to dismiss both of those counts of murder based upon the testimony under oath and the diagrams of the evidence that's been presented
 
 *524
 
 in this courtroom as to the Defendant firing any weapon into that trailer.
 

 Defendant clearly made a motion to dismiss the charge of first-degree murder of Garner. However the trial transcript shows Defendant neither moved to dismiss the charge of second-degree murder nor argued there was insufficient evidence of the elements of second-degree murder. Thus, Defendant failed to preserve for appellate review the issue of the sufficiency of the evidence of the charge of second-degree murder.
 
 See
 
 N.C. R. App. P. 10(a)(1), N.C. R. App. P. 10(a)(3) ;
 
 see also
 

 State v. Neville
 
 ,
 
 202 N.C. App. 121
 
 , 124,
 
 688 S.E.2d 76
 
 , 79 (holding "Defendant neither moved to dismiss the charge of second-degree murder, nor argued to the trial court that there was insufficient evidence of any of the elements of second-degree murder. Thus, Defendant failed to preserve for appellate review the sufficiency of the evidence charge.") (citation omitted)
 
 disc. review denied
 
 ,
 
 364 N.C. 130
 
 ,
 
 696 S.E.2d 696
 
 (2010).
 

 C. AWDWIKISI
 

 Defendant next argues the trial court erred in denying Defendant's motion to dismiss the charge of AWDWIKISI as to Stokes. Specifically, Defendant argues the State had to establish Defendant specifically intended to kill Stokes when Defendant fired into Kornegay's trailer. This contention is without merit.
 

 "In order to withstand a motion to dismiss the charge at issue, the State must present substantial evidence of the following elements: (1) an assault, (2) with a deadly weapon, (3) an intent to kill, and (4) infliction of a serious injury not resulting in death."
 

 *348
 

 State v. Alexander
 
 ,
 
 337 N.C. 182
 
 , 187,
 
 446 S.E.2d 83
 
 , 86 (1994). Substantial evidence is the amount of evidence "a reasonable mind might accept as adequate to support a conclusion."
 

 Id.
 

 at 187
 
 ,
 
 446 S.E.2d at 86
 
 . "[I]t is well settled that the evidence is to be considered in the light most favorable to the State and that the State is entitled to every reasonable inference to be drawn therefrom."
 

 Id.
 

 at 187
 
 ,
 
 446 S.E.2d at 86
 
 .
 

 Our State Supreme Court held:
 

 An intent to kill is a mental attitude, and ordinarily it must be proved, if proven at all, by circumstantial evidence, that is, by proving facts from which the fact sought to be proven may be reasonably inferred. [T]he nature of the assault, the manner in which it was made, the weapon, if any, used, and the surrounding circumstances are all matters from which an intent to kill may be inferred.
 

 *525
 

 State v. Grigsby
 
 ,
 
 351 N.C. 454
 
 , 457,
 
 526 S.E.2d 460
 
 , 462 (2000) (internal citations and quotation marks omitted). Furthermore, "an assailant must be held to intend the natural consequences of his deliberate act."
 
 Id
 
 . at 457,
 
 526 S.E.2d at 462
 
 (quoting
 
 State v. Jones
 
 ,
 
 18 N.C. App. 531
 
 , 534,
 
 197 S.E.2d 268
 
 , 270,
 
 cert. denied
 
 ,
 
 283 N.C. 756
 
 ,
 
 198 S.E.2d 726
 
 (1973) ).
 

 It is not determinative to this issue whether or not Defendant knew Stokes was in the trailer. In
 
 Alexander
 
 , the North Carolina Supreme Court upheld the trial court's submission of an AWDWIKISI charge to the jury when a defendant and his accomplice fired into a vehicle, and there was no evidence defendant knew a specific victim was inside that vehicle.
 
 Id.
 
 at 185-88,
 
 446 S.E.2d at 85-86
 
 . There, the Court stated, "when a person fires a twelve-gauge shotgun into a moving vehicle, it may fairly be inferred that the person intended to kill
 
 whoever
 
 was inside the vehicle."
 

 Id.
 

 at 188
 
 ,
 
 446 S.E.2d at 87
 
 (emphasis added).
 

 Applying these principles to the present case, there was sufficient evidence for the jury to infer Defendant intended to kill whoever was inside the trailer. Here, "the nature of the assault, the manner in which it was made, [and] the weapon ... used" provide "substantial evidence" of intent to kill.
 

 Id.
 

 at 188
 
 ,
 
 446 S.E.2d at 87
 
 . The State's evidence showed Defendant was armed during the time of the shooting, and he fired numerous times into Kornegay's trailer. Defendant also knew the trailer into which he opened fire was occupied. Additionally, Thompson told Defendant not to do anything he would regret, and Defendant replied he would "bond out" for whatever he did. Considering the nature of the assault, the fact Defendant used a gun, and the other surrounding circumstances, we conclude there was sufficient evidence for the trial court to present the jury with the AWDWIKISI charge.
 

 In connection with this issue, Defendant argues this Court should reverse his conviction of AWDWIKISI as to Stokes because the trial court did not instruct the jury on the doctrine of transferred intent. Our State Supreme Court discussed the doctrine of transferred intent:
 

 It is an accepted principle of law that where one is engaged in an affray with another and unintentionally kills a bystander or a third person, his act shall be interpreted with reference to his intent and conduct towards his adversary. Criminal liability, if any, and the degree of homicide must thereby be determined. Such a person is guilty or innocent exactly as the fatal act had caused the death of his adversary.
 

 *526
 

 State v. Wynn,
 

 278 N.C. 513
 
 , 519,
 
 180 S.E.2d 135
 
 , 139 (1971). However, the State did not argue transferred intent as a basis to show Defendant's intent to kill Stokes. Rather, as discussed
 
 supra,
 
 the State's evidence tended to show Defendant knew the trailer was occupied by at least two people when Defendant fired numerous times into the trailer. Based on the nature of the assault, the State's evidence was sufficient for the jury to find Defendant intended to kill "whoever" was in the trailer.
 
 See
 

 Alexander
 
 at 188,
 
 446 S.E.2d at 86
 
 . The State did not argue transferred intent at trial, and neither party requested the transferred intent instruction. This argument is without merit.
 

 *349
 

 D. Jury Deliberations and Subsequent Instructions
 

 Defendant lastly contends the trial court erred in giving the jury a coercive instruction after the jury informed the trial court it was deadlocked. Because we conclude the trial court's instructions to the jury to continue its deliberations were in accordance with N.C. Gen. Stat. § 15A-1235(b), we disagree.
 

 "In criminal cases, an issue that was not preserved by objection noted at trial ... may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(a)(4) (2016). Here, Defendant did not object to the trial court's instructions and remark to the jury upon the judge's learning the jury was deadlocked. Thus, the plain error standard applies.
 

 "[I]n deciding whether a court's instructions force a verdict or merely serve as a catalyst for further deliberations, an appellate court must consider the circumstances under which the instructions were made and the probable impact of the instructions on the jury."
 
 State v. Peek
 
 ,
 
 313 N.C. 266
 
 , 271,
 
 328 S.E.2d 249
 
 , 253 (1985). Under a totality of the circumstances review, this Court generally considers "whether the trial court conveyed an impression to the jurors that it was irritated with them for not reaching a verdict and whether the trial court intimated to the jurors that it would hold them until they reached a verdict."
 
 State v. Porter
 
 ,
 
 340 N.C. 320
 
 , 335,
 
 457 S.E.2d 716
 
 , 723 (1995) (citation omitted). This Court additionally considers the amount of time the jury deliberated, the complexity of the case, and the content and tone of the court's instructions to the jury.
 
 See
 

 State v. Patterson
 
 ,
 
 332 N.C. 409
 
 , 416,
 
 420 S.E.2d 98
 
 , 101 (1992).
 

 Here, the jury informed the trial court three times it was unable to reach a unanimous verdict. Each time the trial court gave the jury an instruction consistent with N.C. Gen. Stat. § 15A-1235(b). After the jury
 
 *527
 
 had deliberated less than five hours in a single day, and after its third note to the trial court stating it was deadlocked, the trial court informed the jury it was sending them back to further deliberate with the same instructions it had previously given. However, this time, the trial court added, "after five days of testimony and less than 5 hours of deliberations, these folks deserve better." Defendant contends this comment was impermissibly coercive, and left the jurors with the impression the judge was irritated with them for not reaching a verdict. This argument is not persuasive.
 

 The record does not suggest the trial court expressed irritation with the jury for not yet reaching a verdict. The record suggests the judge was polite, patient, and accommodating. The trial court properly gave the jury an
 
 Allen
 
 charge pursuant to N.C. Gen. Stat. § 15A-1235(b) each time it stated it was deadlocked. Prior to its final comment, the jury received a lunch break, a recess and a meal. After the third impasse, the trial court gave the jury a choice to continue to deliberate that day, or to go home and continue deliberations the next day. In view of the totality of the circumstances, the trial court's comment was not coercive. We therefore conclude the trial court's comment did not prejudice Defendant and did not amount to plain error in this case.
 

 E. Ineffective Assistance of Counsel
 

 Defendant contends if his trial counsel did not preserve the sufficiency of evidence issues with his motions to dismiss, then his counsel provided ineffective assistance of counsel. Generally, ineffective assistance of counsel claims "should be considered through motions for appropriate relief and not on direct appeal."
 
 State v. Stroud
 
 ,
 
 147 N.C. App. 549
 
 , 553,
 
 557 S.E.2d 544
 
 , 547 (2001). We dismiss Defendant's claims of ineffective assistance of counsel without prejudice and conclude Defendant is free to assert his claims during a later MAR proceeding with a more complete factual record.
 

 IV. Conclusion
 

 We find no error in Defendant's convictions.
 

 NO ERROR.
 

 Judges DILLON and ARROWOOD concur.
 

 [1]
 

 The State contends Defendant failed to preserve this issue for review because counsel for defense neither made a general motion to dismiss nor moved to dismiss the charge of first-degree murder based on the theory of lying in wait. Defense counsel did argue for dismissal on the specific theories of premeditation and deliberation however. Since the record is unclear whether defense counsel actually made a general motion to dismiss the first-degree murder charge, this Court shall give defense counsel the benefit of the doubt.