STATE OF NORTH CAROLINA v. JEFFERY WAYNE SANDERS

No. COA10-233

(Filed 16 November 2010)

**Conspiracy— assault with deadly weapon with intent to kill inflicting serious injury—motion to dismiss—sufficiency of evidence**

A *de novo* review revealed the trial court did not err by failing to dismiss the charge of conspiracy to commit assault with a deadly weapon with intent to kill inflicting serious injury. The acts viewed collectively showed that the men formed an implied agreement, however impulsively, to assault the victim.

Appeal by defendant from judgment entered 1 October 2009 by Judge Phyllis M. Gorham in Carteret County Superior Court. Heard in the Court of Appeals 14 September 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Donald W. Laton, for the State.*

*Greene & Wilson, P.A., by Thomas Reston Wilson, for defendant-appellant.*

HUNTER, JR., Robert N., Judge.

Jeffery Wayne Sanders ("defendant") appeals from a jury verdict finding him guilty of assault with a deadly weapon inflicting serious injury and of conspiracy to commit assault inflicting serious injury. Defendant argues that the trial court erred in failing to dismiss the charge of conspiracy for reason of insufficient evidence. We find no error.

## I. Factual & Procedural History

On 10 December 2008, Jonathan Norman ("Norman") was celebrating his birthday with girlfriend Brittany Gibbs ("Gibbs") at the house of a mutual friend, Melissa Sanderlin ("Sanderlin"). During the celebration, Sanderlin received a phone call from Joseph Salter ("Salter"), suggesting that Salter and Norman settle their rivalry for Gibbs' affection with a fight. Norman agreed to the fight. Because Salter had several friends with him, Norman called upon defendant, Willard Sanders (defendant's father), and friend Jonathan Gillikin ("Gillikin") to join Norman in the fight. Shortly thereafter, the men

arrived in a truck driven by defendant, picked up Norman, and drove down the road to the home of Josh Lester ("Lester") where the fight was to occur. When they arrived at the Lester residence everyone "piled out" of the truck, began "hollering," and prepared to fight Salter. Lester's parents came out of the home and told everyone to leave the property; there would be no fight.

Norman, defendant, defendant's father, and Gillikin got into the cab and the bed of the truck and drove away with beers in hand, "raising Cain," and hollering. A neighbor, Mark Buffaloe, was outside of his home hanging Christmas decorations when he heard the commotion at the Lester residence. Mark Buffaloe called the police and was standing in his front yard with his son, Justin Buffaloe, as defendant's truck approached his yard. As the truck drove by, defendant's father, riding in the truck bed, yelled at Mark and Justin Buffaloe, "What the [expletive deleted] are you looking at?" Justin Buffaloe shouted back, "Why do you have to holler like you live in the ghetto?" Defendant then abruptly stopped the truck in front of the Buffaloes' home. Defendant's father jumped out, asked the Buffaloes if they "want[ed] a war," punched Justin Buffaloe in the mouth, and grabbed him by the throat. Mark Buffaloe attempted to intervene and stop any further attacks on his son by defendant's father. Testimony elicited at trial tended to show that, when Mark Buffaloe intervened to protect his son, defendant, Norman, and Gillikin jumped out of the truck to join the altercation and were heard to say, "we'll give you a war," and "let's go" or "let's go get them." There was conflicting testimony as to the sequence of punches thrown once these three men joined the fight. Several witnesses testified, however, that defendant broke away from the fight, walked back to the truck and retrieved a wooden dowel rod. Defendant was heard to say, "I'll finish him off with this" or "I'll finish it," and he then struck Mark Buffaloe several times on the head with the dowel rod until it broke. A few moments later, a deputy from the Carteret County Sheriff's Department arrived on the scene. Mark Buffaloe was taken to the hospital for treatment of his injuries which included a fractured skull, brain hemorrhage, and damage to his left eye.

On 11 December 2008, a warrant was issued for defendant's arrest. Two bills of indictment were returned by a Carteret County grand jury on 9 February 2009. The first indictment charged defendant with a single count of assault with a deadly weapon with intent to kill and inflicting serious injury on Mark Buffaloe. The second indictment charged defendant with a single count of felony conspiracy to

commit assault with a deadly weapon with intent to kill inflicting serious injury on Mark Buffaloe. Norman and Gillikin were charged for the same offenses and joined as codefendants for trial. Defendant's trial was held in Carteret County Superior Court during the 28 September 2009 Criminal Session. At the close of all the evidence, the trial court instructed the jury as agreed upon by the State and the defense during the charge conference. During deliberations, the jury requested further guidance on the definition of conspiracy, specifically asking: "When does a conspiracy stop and start? Does it transfer from one set of circumstances to a second?" Citing *State v. Christian*, 150 N.C. App. 77, 562 S.E.2d 568 (2002), the trial court, over defendant's objection, provided the following additional instruction to the jury:

A criminal conspiracy is an agreement between two or more people to do an unlawful act or to do a lawful act in an unlawful manner. In order to prove conspiracy, the State need not prove an express agreement. Evidence tending to show a mutual implied understanding will suffice. This evidence may be circumstantial or inferred from the defendant's behavior. The crime of conspiracy does not require an overt act for its completion. The agreement itself is the crime. Proof—proof of a conspiracy may also be, and generally is, established by a number of indefinite acts, each of which standing alone might have little weight, but taken collectively they point unerringly to the existence of conspiracy.

On 1 October 2009, the jury returned verdicts of guilty as to the lesser charges of assault with a deadly weapon inflicting serious injury and conspiracy to commit assault inflicting serious injury. The two charges were consolidated and the trial court imposed an active sentence of 24 to 38 months. Defendant timely entered notice of appeal.

## II. Jurisdiction and Standard of Review

As defendant appeals from a final judgment, this Court has jurisdiction to hear the appeal pursuant to N.C. Gen. Stat. § 7A-27(b) (2009). We review the trial court's denial of a motion to dismiss *de novo*. *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). This Court, under a *de novo* standard of review, considers the matter anew and freely substitutes its own judgment for that of the trial court. *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008). A defendant's motion to dismiss should be denied if "there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defend-

ant's being the perpetrator of such offense." *State v. Scott*, 356 N.C. 591, 595, 573 S.E.2d 866, 868 (2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). When ruling on a motion to dismiss, the trial court must view the evidence in the light most favorable to the State, "making all reasonable inferences from the evidence in favor of the State." *State v. Kemmerlin*, 356 N.C. 446, 473, 573 S.E.2d 870, 889 (2002). "The trial court in considering such motions is concerned only with the sufficiency of the evidence to carry the case to the jury and not with its weight." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980). Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. *Id.*

### III. Analysis

On appeal, defendant contends that the trial court erred by denying defendant's motions to dismiss the charge of conspiracy at the close of the State's evidence and at the close of all the evidence. Specifically, defendant alleges the State failed to present evidence of an agreement sufficient to support a conspiracy conviction as to the assault of Mark Buffaloe. According to defendant, the only conspiracy that existed, if any, was for the fight he, his friends, and his father intended to have with Joseph Salter, but which they abandoned. Defendant argues that the fight that actually occurred, wherein defendant, his friends, and his father assaulted Mark Buffaloe, was unplanned and not the result of a conspiracy. Defendant contends the jury improperly used his agreement to assault Joseph Salter to convict him of a conspiracy to assault Mark Buffaloe. We disagree.

The elements of felonious assault are satisfied when: (1) one person assaults another; (2) with a deadly weapon; (3) with the intent to kill; and (4) the assault results in serious injury to the victim. N.C. Gen. Stat. § 14-32(a) (2009). A criminal conspiracy is "an agreement, express or implied, between two or more persons, to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means." *State v. Gell*, 351 N.C. 192, 209, 524 S.E.2d 332, 343 (2000). Under the law of conspiracy, the agreement need not be express; " ' "[a] mutual, implied understanding is sufficient . . . ." ' " *State v. Lawrence*, 352 N.C. 1, 24-25, 530 S.E.2d 807, 822 (2000) (citations omitted). Direct proof of the charge is not essential and is rarely obtainable. *State v. Whiteside*, 204 N.C. 710, 712, 169 S.E. 711, 712 (1933). A conspiracy

generally is "established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *Id.* Criminal conspiracy is complete upon "a meeting of the minds," *State v. Christopher*, 307 N.C. 645, 649, 300 S.E.2d 381, 383 (1983), when the parties to the conspiracy

> (1) give sufficient thought to the matter, however briefly or even impulsively, to be able mentally to appreciate or articulate the object of the conspiracy, the objective to be achieved or the act to be committed, and (2) whether informed by words or by gesture, understand that another person also achieves that conceptualization and agrees to cooperate in the achievement of that objective or the commission of the act.

15A C.J.S. *Conspiracy* § 114 (2002) (citing *Mitchell v. State*, 363 Md. 130, 767 A.2d 844 (2001)). "Ordinarily, the existence of a conspiracy is a jury question," and where reasonable minds could conclude that a meeting of the minds exists, the trial court does not err in denying a motion to dismiss for insufficiency of the evidence. *See State v. Larrimore*, 340 N.C. 119, 156, 456 S.E.2d 789, 809 (1995).

We find unpersuasive defendant's effort to imply the absence of a meeting of the minds by contrasting his well-orchestrated attempt to assault Joseph Salter with the abrupt nature of his assault of Mark Buffaloe. The spontaneity of the plan does not belie the conspiracy. Similarly, in the context of a unilateral contract, a meeting of the minds can exist when a party thereto accepts an offer by action not by words.

While we may agree with defendant the evidence tends to show that as the group left the Salters' residence these men had no intent to assault anyone else, concluding so does not preclude us from finding that a conspiracy arose after defendant arrived at the Buffaloes' residence. Defendant argues that the events leading up to the attack on Mark and Justin Buffaloe occurred in a matter of seconds and that there was no evidence of a common plan or purpose to support the charge of conspiracy. This argument is undermined by the testimony elicited at trial.

Several witnesses testified that defendant, defendant's father, Jonathan Norman, and Jonathan Gillikin set out to fight Joseph Salter and anyone who may have been with him. Ready for a fight, but told to leave the Salters' property, the group drove away, hollering and

STATE v. SANDERS

[208 N.C. App. 142 (2010)]

creating a commotion as they approached the Buffaloes' home. Upon hearing Justin Buffaloe chastise the group for their rowdy behavior, defendant abruptly stopped the truck and defendant's father jumped out of the truck bed. Defendant's father charged toward Justin Buffaloe, and loudly asked if the Buffaloes "want[ed] a war." It was at that moment that defendant and his codefendants were heard to respond, "we'll give you a war," and "let's go" or "let's go get them." Defendant then exited the truck and joined the fight. Defendant briefly broke away from the fight, stated, "I'll finish him off," retrieved a wooden dowel rod from his truck and returned to strike Mark Buffaloe in the head.

We conclude these acts when viewed individually may not evidence a conspiracy; but when viewed collectively, evidence the men formed an implied agreement, however impulsively, to assault Mark Buffaloe. Thus, while defendant argues that the jury relied upon the wrong conspiracy—the Salter conspiracy—to convict him of a conspiracy to assault Mark Buffaloe, we believe it is defendant's reliance that is misplaced. The testimony was sufficient to permit the jury to conclude that defendant or one of his friends suggested they all join the fight and assault Mark Buffaloe. By his actions—exiting the truck and beating Mark Buffaloe—and by his words—"I'll finish him off"—the jury could conclude that defendant understood the objective of the conspiracy and agreed to it.

## IV. Conclusion

We find there was substantial evidence before the trial court that defendant conspired to assault Mark Buffaloe with a deadly weapon with intent to kill inflicting serious injury. Accordingly, the trial court did not err in denying defendant's motions to dismiss.

No error.

Judges HUNTER, Robert C., and WALKER concur.