IN THE SUPREME COURT OF NORTH CAROLINA

No. 6A19

Filed 1 May 2020

STATE OF NORTH CAROLINA

v.

PATRICK MYLETT

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 822 S.E.2d 518 (N.C. Ct. App. 2018), finding no error after appeal from a judgment entered on 2 February 2017 by Judge Marvin P. Pope, Jr. in Superior Court, Watauga County. Heard in the Supreme Court on 8 January 2020.

*Joshua H. Stein, Attorney General, by Ryan Y. Park, Deputy Solicitor General, for the State-appellee.*

*Goodman Carr, PLLC, by W. Rob Heroy, for defendant-appellant.*

*Tin Fulton Walker & Owen, PLLC, by Noell P. Tin; and Scott & Cyan Banister First Amendment Clinic, UCLA School of Law, by Eugene Volokh, for Pennsylvania Center for the First Amendment, amicus curiae.*

EARLS, Justice.

Defendant, Patrick Mylett, attended the trial of his twin brother who was found guilty of assault on a government official by a jury in Superior Court, Watauga County, on 31 March 2016. Approximately eleven months later, defendant was convicted of conspiracy to commit harassment of a juror in the same county because of his actions at the Watauga County Courthouse following his brother's conviction.

Because the evidence in defendant's trial was insufficient to raise anything more than mere conjecture that he had made an agreement with another person to threaten or intimidate a juror, it was error for the trial court to deny his motion to dismiss.

Background

On 29 August 2015, defendant and his twin brother, Dan, were involved in an altercation at a fraternity party in Boone, North Carolina, during which Dan was severely beaten, requiring hospitalization. Dan was subsequently charged with assault on a government official for allegedly spitting on a law enforcement officer during the incident. At the end of the trial, at which defendant testified on Dan's behalf, the jury found Dan guilty of the offense on 31 March 2016. After Dan's sentencing, defendant exited the courtroom and was waiting in the lobby of the courthouse as jurors began exiting the courtroom and retrieving their belongings from a nearby jury room[1] before departing. During this time, defendant confronted and spoke to multiple jurors about the case. When Dan, Dan's girlfriend (Kathryn), and defendant's mother subsequently exited the courtroom, Dan and Kathryn also spoke to jurors as the jurors were leaving. Video footage of these interactions, without audio, was captured by video cameras in and around the courthouse. When Dan's attorney exited the courtroom approximately two and one-half minutes after

---

[1] This "jury room" or "jury lounge" appears to be on the opposite side of the lobby from the courtroom and is where the jury would go for breaks during the trial.

defendant first left the courtroom, he joined defendant and defendant's group in the lobby and they departed from the courthouse.

On 19 April 2016, defendant was arrested and charged with six counts of harassment of a juror pursuant to N.C.G.S. § 14-225.2(a)(2), which provides that an individual "is guilty of harassment of a juror if" the individual "[a]s a result of the prior official action of another as a juror in a . . . trial, threatens in any manner or in any place, or intimidates the former juror or his spouse." Defendant was also charged with one count of conspiracy to commit harassment of a juror pursuant to N.C.G.S. § 14-225.2(a)(2) (2015). The Watauga County grand jury subsequently indicted defendant for these charges.

Defendant filed pretrial motions to dismiss, including a motion arguing that N.C.G.S. § 14-225.2(a)(2) is unconstitutional under the First Amendment and a motion arguing that the statute is unconstitutionally vague and overbroad. The trial court denied defendant's motions.

At trial, six jurors from Dan's trial testified as witnesses for the State. At the close of the State's evidence, defendant renewed his pretrial motions and also moved to dismiss for insufficiency of the evidence. The trial court denied these motions. Following the presentation of defendant's evidence, including his own testimony, defendant renewed his motions to dismiss at the close of all evidence. The trial court again denied these motions. At the charge conference, defendant requested that the trial court instruct the jury that in order to find him guilty, the jury must find that

his conduct constituted a true threat or that he intended to intimidate the jurors. The trial court denied the requested instruction.

The jury found defendant not guilty of the six counts of harassment of a juror. However, the jury found defendant guilty of the single offense of conspiracy to commit harassment of a juror. The trial court sentenced defendant to forty-five days in the custody of the sheriff of Watauga County, suspended his active sentence, and placed defendant on eighteen months of supervised probation. Additionally, the trial court ordered defendant, *inter alia*, to perform fifty hours of community service, successfully complete an anger management course and follow any recommended treatment, and obtain twenty hours of weekly employment. Further, the trial court imposed "a curfew of 6 p.m. to 6 a.m. for a period of four months . . . which can be accomplished by electronic monitoring," requiring defendant to remain at his residence except for employment and school classes during the period of the curfew. Defendant appealed.

At the Court of Appeals, defendant first argued that the trial court erred in denying his motions to dismiss on the basis of the constitutionality of N.C.G.S. § 14-225.2(a)(2). *State v. Mylett*, 822 S.E.2d 518, 523 (N.C. Ct. App. 2018). The Court of Appeals majority disagreed, concluding that the statute applies to nonexpressive conduct and does not implicate the First Amendment. *Id.* at 524. Further, the majority determined that even assuming the First Amendment was implicated, the statute survives intermediate scrutiny as a content-neutral restriction. *Id.* at 524–

26. Additionally, the majority rejected defendant's contentions that the undefined term "intimidate" renders N.C.G.S. § 14-225.2(a)(2) unconstitutionally void for vagueness and that the trial court erred in denying defendant's request for a jury instruction defining "intimidate" as requiring a "true threat." *Id.* at 526, 530. Finally,[2] the majority concluded that the trial court did not err in denying defendant's motion to dismiss the conspiracy charge for insufficient evidence. *Id.* at 531.

Writing separately, Chief Judge McGee dissented, opining first that N.C.G.S. § 14-225.2(a)(2) is unconstitutional both on its face and as applied to defendant and that the trial court erred in denying defendant's request for a jury instruction defining "intimidation." *Id.* at 531–41 (McGee, C.J., dissenting). Moreover, Chief Judge McGee concluded that even in the absence of any "true threat" requirement, the State presented insufficient evidence to support the conspiracy charge. *Id.* at 541–45.

On 7 January 2019, defendant filed a notice of appeal as of right based on the dissenting opinion in the Court of Appeals pursuant to N.C.G.S. 7A-30(2).

Analysis

---

[2] The majority also rejected defendant's challenges to evidentiary rulings by the trial court, including defendant's arguments "that the trial court erroneously (1) excluded a Facebook post proffered by defendant to impeach a juror-witness and (2) admitted the juror-witnesses' testimony about the fraternity party fight underlying Dan's trial, while excluding defendant's testimony about the same issue." *State v. Mylett*, 822 S.E.2d 518, 528 (N.C. Ct. App. 2018). The dissenting judge did not address these issues, and defendant did not seek further review of these issues in this Court.

Defendant argues that the Court of Appeals majority erred in: (1) concluding that the State presented sufficient evidence of a conspiracy to threaten or intimidate a juror; (2) rejecting defendant's constitutional challenges to N.C.G.S. § 14-225.2(a)(2) on the basis that it violates his First Amendment rights and that it is unconstitutionally vague and overbroad; and (3) concluding that the trial court did not err in denying defendant's requested jury instruction defining "intimidate." We conclude that there was insufficient evidence of a conspiracy to threaten or intimidate a juror and therefore the trial court erred in denying defendant's motion to dismiss the conspiracy charge. In light of our holding, we need not address defendant's other contentions.

When ruling on a defendant's motion to dismiss for sufficiency of the evidence, the trial court must determine "whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980) (first citing *State v. Roseman*, 279 N.C. 573, 580, 184 S.E.2d 289, 294 (1971); then citing *State v. Mason*, 279 N.C. 435, 439, 183 S.E.2d 661, 663 (1971)). "Substantial evidence is evidence from which any rational trier of fact could find the fact to be proved beyond a reasonable doubt." *State v. Sumpter*, 318 N.C. 102, 108, 347 S.E.2d 396, 399 (1986) (first citing *State v. Pridgen*, 313 N.C. 80, 94–95, 326 S.E.2d 618, 627 (1985); then citing *State v. Jones*, 303 N.C. 500, 504, 279 S.E.2d 835, 838 (1981)). "[T]he trial court must consider the evidence in the light

most favorable to the State, drawing all reasonable inferences in the State's favor." *State v. Miller*, 363 N.C. 96, 98, 678 S.E.2d 592, 594 (2009) (citing *State v. McCullers*, 341 N.C. 19, 28–29, 460 S.E.2d 163, 168 (1995)). "A motion to dismiss should be granted, however, 'where the facts and circumstances warranted by the evidence do no more than raise a suspicion of guilt or conjecture since there would still remain a reasonable doubt as to defendant's guilt.' " *State v. Turnage*, 362 N.C. 491, 494, 666 S.E.2d 753, 755 (2008) (quoting *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988)); *see also Sumpter*, 318 N.C. at 108, 347 S.E.2d at 399 ("Evidence is not substantial if it arouses only a suspicion about the fact to be proved, even if the suspicion is strong." (citing *State v. Malloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983))). "Whether the State has presented substantial evidence is a question of law, which we review de novo." *State v. China*, 370 N.C. 627, 632, 811 S.E.2d 145, 149 (2018) (citing *State v. Cox*, 367 N.C. 147, 150–51, 749 S.E.2d 271, 274–75 (2013)).

"A criminal conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means." *State v. Gibbs*, 335 N.C. 1, 47, 436 S.E.2d 321, 347 (1993) (quoting *State v. Bindyke*, 288 N.C. 608, 615–16, 220 S.E.2d 521, 526 (1975)). "In order to prove conspiracy, the State need not prove an express agreement; evidence tending to show a mutual, implied understanding will suffice." *State v. Winkler*, 368 N.C. 572, 575, 780 S.E.2d 824, 827 (2015) (quoting *State v. Morgan*, 329 N.C. 654, 658, 406 S.E.2d 833, 835 (1991)). Because "[t]he conspiracy is the crime and not its execution," *Gibbs*, 335 N.C.

at 47, 436 S.E.2d at 347 (citation omitted), "[t]he crime of conspiracy is complete when there is a meeting of the minds and no overt act is necessary," *State v. Christopher*, 307 N.C. 645, 649, 300 S.E.2d 381, 383 (1983) (citing *State v. Gallimore*, 272 N.C. 528, 158 S.E.2d 505 (1969)).  Nonetheless, there must exist an agreement, and the parties to a conspiracy must "intend[ ] the agreement to be carried out at the time it was made."  *State v. Jenkins*, 167 N.C. App. 696, 700, 606 S.E.2d 430, 433 (citing *State v. Diaz*, 155 N.C. App. 307, 319, 575 S.E.2d 523, 531 (2002)), *aff'd per curiam*, 359 N.C. 423, 611 S.E.2d 833 (2005).  Moreover, while a conspiracy can be established through circumstantial evidence, there must be "such evidence to prove the agreement directly or such a state of facts that an agreement may be legally inferred. Conspiracies cannot be established by a mere suspicion, nor does evidence of mere relationship between the parties or association show a conspiracy." *State v. Williams*, 255 N.C. 82, 86, 120 S.E.2d 442, 446 (1961) (quoting *State v. Phillips*, 240 N.C. 516, 521, 82 S.E.2d 762, 766 (1954)).

Here, the unlawful act at issue is the alleged violation of N.C.G.S. § 14-225.2(a)(2), which, as noted above, provides that an individual "is guilty of harassment of a juror if" the individual "[a]s a result of the prior official action of another as a juror in a . . . trial, threatens in any manner or in any place, or intimidates the former juror or his spouse."  Accordingly, in order to survive a motion to dismiss, the State was required to present substantial evidence showing that

defendant entered into an agreement with one or more persons to threaten or intimidate a juror from his brother's trial.[3]

Viewing the evidence in the light most favorable to the State, including the videos from the courthouse and the witness testimony, there is simply insufficient evidence to reasonably infer the existence of any agreement to threaten or intimidate a juror. The evidence shows that at the conclusion of Dan's sentencing hearing, defendant exited the courtroom from a door off of the lobby (the courtroom door) and was standing alone by a common-area table waiting with his hands in his pockets when the first of the jurors, Rose Nelson, exited from the courtroom door further down the hall (the far door). Nelson testified that as she walked past defendant, heading for the stairwell to exit the building, defendant stated that "he hoped that [she] could live with [her]self because [she] had convicted an innocent man, and then as [she] was making [her] way to the stairs trying to get down the stairs, he was saying something about the crooked Boone police, and he hoped that [she] slept well." After

---

[3] Defendant argues that in order for N.C.G.S. § 14-225.2(a)(2) to pass constitutional muster, "intimidates" must be defined to require a "true threat," which are "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.*" State v. Bishop*, 368 N.C. 869, 87 8 n.3, 787 S.E.2d 814, 821 n.3 (2016) (quoting*Virginia v. Black*, 538 U.S. 343, 359 (2003)). We assume, without deciding, that "intimidates" for the purposes of N.C.G.S. § 14-225.2(a)(2) *does not* require "a serious expression of an intent to commit an act of unlawful violence." To be clear, we express no opinion on the constitutionality of N.C.G.S. § 14-225.2(a)(2) or whether "intimidates" requires a true threat. We hold that, assuming *arguendo* that the statute should be construed as urged by the State, the State did not present substantial evidence that defendant entered into an agreement with another person to threaten or intimidate a juror.

Nelson left the courthouse, defendant slowly paced across the room and was waiting by the courtroom door when four more jurors, Kinney Baughman, William Dacchille, Denise Mullis, and Lorraine Ratchford, exited the far door and crossed the lobby to the jury room. According to their testimony, as these jurors walked by defendant, defendant stated to Baughman "that his brother was an innocent man, [and] that [Baughman] had done wrong," told Dacchille that "[Dan is] an innocent man, he's an innocent man," stated to Mullis that she "got it wrong, that [she] made a mistake," and told Ratchford, "congratulations, you just ruined his life."

As these four jurors were entering the jury room across the lobby, Kathryn, defendant's mother, and Dan, in that order, exited the courtroom door, approximately one minute and twenty seconds after defendant first left the courtroom. Kathryn was crying as she left the courtroom, and defendant had a brief interaction with her in which he came from behind the door and placed his hand on her head and shoulder to console her as she moved around the door and towards the nearby wall. As this was happening, Dan exited the doorway last and, before having any interaction with defendant, spotted Baughman exiting the jury room. Dan, shaking his head, immediately walked across the lobby toward Baughman and began speaking to him. Defendant and Kathryn then walked across the lobby and were standing behind Dan with defendant's mother as Baughman exited the jury room and started walking back toward the far door. Kathryn also began speaking to Baughman and, according to Baughman, stated: "you convicted him, you sent him to jail, you ruined his life and

it's all your fault." Dan and Kathryn were both speaking to Baughman as he walked past defendant's group, and both of them moved back to make way for him to walk toward the hallway. While this was occurring, Dacchille, Mullis, and Ratchford were still in the jury room and could not hear what was being said, except Ratchford heard Kathryn "screaming he'll never get a job."

Baughman was nearing the hallway and the far door when defendant said something to him, at which point Baughman turned back and engaged with defendant while crossing the lobby again, this time heading for the stairwell. Baughman attempted to explain the jury's verdict while walking slowly toward the stairwell. Baughmen testified that as "a former professor, [he] like[s] to explain things." According to Baughman, defendant was not raising his voice but "was clearly upset about the verdict" and defendant's tone was "not pleasant." Baughman explained: "Well, it's firm, but, I mean, he's not yelling at me here. So the way I recall was, [defendant was saying] my brother was innocent, he's an innocent man, and, you know, we had done wrong. In this case, you know, I'd done - - you done wrong." During this discussion, defendant and Kathryn both moved away from Baughman, insuring his path was not blocked, as Baughman headed for the stairwell. The video shows that after Baughman entered the stairwell, defendant walked over to the stairwell twelve seconds later, followed by Dan, their mother, and then Kathryn. Baughman stated that Kathryn was "the one that was really screaming and yelling at me more than anybody else, but they were all pointing their fingers in

my face as I was sitting down -- I was standing in the stairway and they're hanging over the railing and telling me I ruined this kid's life." Approximately ten or eleven seconds later, defendant's group returned to where they were initially standing in the lobby. The attention of defendant, Dan, and Kathryn was focused almost exclusively on Baughman from the time he exited the jury room, and neither Dachille nor Ratchford had any more troubling interactions with defendant's group as they left the jury room and went down the stairs to leave.

Finally, the last of the six jurors, Charlotte Lino (Lino), came from the hallway near the far door, crossed the lobby, and started down the stairs, where she encountered Mullis waiting in the stairwell. Lino testified that as she passed defendant's group, one of them told her "he'll never get a job, he won't finish school, and we lie just like the cops do, very intimidating." Shortly after Lino entered the stairwell, Dan's attorney exited the courtroom and joined defendant's group in the lobby, at which point defendant's group immediately moved towards the stairwell to exit the courthouse. Lino testified that defendant's group passed Mullis and her on the way down the stairs, that "it was so crammed in on the staircase," and that defendant's group was talking to them as they passed, telling them "how bad [they] were." According to Mullis, as defendant's group passed them, Dan said "you really blew it," Kathryn said "he'll never get a job" in an "angry, sad" tone, and one member of defendant's group "passed very closely to where somebody was touching [her]."

Approximately two and one half minutes after defendant first left the courtroom alone and entered the lobby, defendant's group exited the courthouse.

The evidence is almost entirely devoid of any interactions between defendant and Dan or defendant and Kathryn from which the formation of any agreement can be inferred. The State does not identify any substantial evidence regarding defendant's conduct prior to the incident in the lobby tending to show any agreement with Dan or Kathryn. Regarding the incident itself, apart from defendant's very brief gesture to console Kathryn, it is not clear that any of the three even made eye contact during the incident, let alone communicated in any manner from which a meeting of the minds can reasonably be inferred. The only clear interaction between these individuals, prior to the arrival of Dan's attorney, was with defendant's mother, who at times attempted to keep defendant and Dan from speaking to the jurors and who the State does not allege was a part of any conspiracy. None of the State's witnesses testified that they heard any statements or saw any actions between defendant and Dan or defendant and Kathryn indicating any agreement to threaten or intimidate a juror.

Nonetheless, the State points to the purported "parallel conduct" of defendant, Dan, and Kathryn, contending that "a jury can infer a conspiracy based on highly synchronized, parallel conduct in furtherance of a crime." We agree with this statement in principle; yet, such an inference would be far stronger where the conduct at issue is more synchronized, more parallel, and more clearly in furtherance of a

crime. For instance, given that the only evidence of contact with the jurors by defendant, Dan, or Kathryn was during this relatively brief incident in the lobby, and that most of the allegedly unlawful contact with the jurors occurred when defendant was in the lobby alone, before defendant's group exited the courtroom, the conduct here is not particularly synchronized. Once defendant's group entered the lobby, the conduct of defendant, Dan, and Kathryn in the lobby while they were waiting for Dan's attorney was hardly the work of a master plan. Moreover, while defendant was acquitted of the charges of harassment of a juror by threats or intimidation and we express no opinion on the sufficiency of the evidence with respect to those charges, the evidence was far from overwhelming. Put simply, this is not a situation like a drug transaction or a bank robbery, where it is evident that an unlawful act has occurred, and where the degree of coordination associated with those unlawful acts renders an inference of "mutual, implied understanding" between the participants far more reasonable. *Winkler*, 368 N.C. at 575, 780 S.E.2d at 827 (quoting *Morgan*, 329 N.C. at 658, 406 S.E.2d at 835).[4]

---

[4] For example, in *State v. Abernathy*, the Court determined that there was no "direct evidence that the defendant . . . expressly agreed" to commit a house robbery, but "the circumstantial evidence [was] sufficient to create an inference that [the defendant] knew of an agreement to rob the [victim's] residence and that there was an implied understanding between him and the others to accomplish this purpose." 295 N.C. 147, 165, 244 S.E.2d 373, 385 (1978). There, the defendant was with one of the robbers beforehand and asked a witness "if [the witness] wanted to make some money to go check out a place." *Id.* Additionally, the evidence showed that the defendant drove the robbers to the house, whereupon he drove by the house one time, turned around at an intersection, and parked at a nearby graveyard, at which point the robbers exited the car with masks, guns and tape and entered the house for thirty minutes to an hour. *Id.* While the robbers were in the house, the defendant drove up

The dissent asserts that our analysis "appears . . . to amount to an analysis of the weight that should be given to the State's evidence," which is a question for the jury, "rather than to its sufficiency." The weight of the evidence is, of course, to be determined by the jury, but only when the State has first presented *substantial evidence* of each element of the offense—that is, evidence from which a rational juror could find the fact to be proved beyond a reasonable doubt. *See Sumpter*, 318 N.C. at 108, 347 S.E.2d at 399 ("Evidence is not substantial if it arouses only a suspicion about the fact to be proved, even if the suspicion is strong." (citing State v. Malloy, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983))).[5] Further, contrary to the dissent's

---

and down the road in front of the house "waiting for the actual robbers in order to assist them in escaping after the robbery was completed." *Id.* at 165–66, 244 S.E.2d at 385.

[5] The dissent also asserts that our approach is inconsistent with this Court's decision in *State v. Whiteside*, in which the Court stated:

> Direct proof of the charge is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy. When resorted to by adroit and crafty persons, the presence of a common design often becomes exceedingly difficult to detect. Indeed, the more skillful and cunning the accused, the less plainly defined are the badges which usually denote their real purpose. Under such conditions, the results accomplished, the divergence of those results from the course which would ordinarily be expected, the situation of the parties, and their antecedent relations to each other, together with the surrounding circumstances, and the inferences legitimately deducible therefrom, furnish, in the absence of direct proof, and often in the teeth of positive testimony to the contrary, ample ground for concluding that a conspiracy exists.

assertion, we do not suggest that proof that alleged conspirators committed a crime is necessary to prove conspiracy; rather, we note only that when the State relies on evidence of similar and simultaneous conduct to establish an agreement to commit an unlawful act, the fact that the evidence of such conduct, even where similar, leaves ample questions of whether an unlawful act has even been committed, tends to lessen the reasonableness of any inference from circumstantial evidence that the individuals involved had an agreement *to commit an unlawful act*—here, an agreement to "threaten" or "intimidate" a juror, as required to support a felony conviction under N.C.G.S. § 14-225.2(a)(2).

In sum, we conclude that the evidence, taken in the light most favorable to the State, raises no more than a suspicion or conjecture of defendant's guilt. As such, the State failed to present substantial evidence that defendant conspired to threaten or intimidate a juror. The trial court therefore erred in denying defendant's motion to dismiss for insufficient evidence.

## Conclusion

---

204 N.C. 710, 712–13, 169 S.E. 711, 712 (1933) (citations omitted). We reiterate that direct evidence of an explicit agreement is not required and that the State may prove conspiracy through circumstantial evidence. *See Winkler*, 368 N.C. at 575 (stating that "the State need not prove an express agreement; evidence tending to show a mutual, implied understanding will suffice" (quoting *Morgan*, 329 N.C. at 658, 406 S.E.2d at 835)). Here, taking the evidence in the light most favorable to the State, we conclude only that the circumstantial evidence and the "inferences legitimately deducible therefrom" amount solely to suspicion or conjecture of the fact to be proved and that the evidence is insufficient to give rise to a reasonable inference that defendant entered an agreement to commit an unlawful act—specifically, an agreement to threaten or intimidate a juror.

For the reasons stated, we reverse the decision of the Court of Appeals finding no error in the trial court's judgment convicting defendant for conspiracy to commit harassment of a juror pursuant to N.C.G.S. § 14-225.2(a)(2).  Because we reach this decision based upon our conclusion that the trial court erred in denying defendant's motion to dismiss the conspiracy charge for insufficient evidence, we decline to address defendant's other arguments, including his constitutional challenges to N.C.G.S. § 14-225.2(a)(2).  *See James v. Bartlett*, 359 N.C. 260, 266, 607 S.E.2d 638, 642 (2005) ("However, appellate courts must 'avoid constitutional questions, even if properly presented, where a case may be resolved on other grounds.' " (quoting *Anderson v. Assimos*, 356 N.C. 415, 416, 572 S.E.2d 101, 102 (2002) (per curiam))).  This case is remanded to the Court of Appeals for further remand to the trial court with instructions to vacate defendant's conviction for conspiracy to commit harassment of a juror and the judgment entered thereon.

REVERSED.

Justice ERVIN, dissenting.

A majority of my colleagues have concluded that the State's evidence, which tends to show that defendant, acting simultaneously with his brother and his brother's girlfriend, confronted a series of jurors leaving the courtroom in which they had just voted to convict defendant's brother of assaulting a law enforcement officer for the purpose of intensely criticizing the verdict rendered by those jurors, does not suffice to establish the existence of the agreement necessary to support defendant's conspiracy conviction. In light of my belief that the Court's decision fails to analyze the evidence in the light most favorable to the State and that, when considered in light of the applicable legal standard, the evidence contained in the record provided ample support for the jury's determination that the necessary agreement did, in fact, exist, I respectfully dissent from the Court's decision.

According to well-established North Carolina law, we are required to evaluate the validity of defendant's challenge to the sufficiency of the evidence to support his conspiracy conviction by viewing the evidence in the light most favorable to the State. *State v. Kemmerlin*, 356 N.C. 446, 473, 573 S.E.2d 870, 889 (2002) (citing *State v. Lucas*, 353 N.C. 568, 581, 548 S.E.2d 712, 721 (2001)). The State's evidence need not be compelling in order to prevent the allowance of a defendant's dismissal motion; instead, the State's evidence need only be "substantial," with "substantial evidence" being the "amount of relevant evidence necessary to persuade a rational juror to accept a conclusion." *Id.* (citing *State v. Frogge*, 351 N.C. 576, 584, 528 S.E.2d 893,

899 (2000)).  For that reason, "the question for the trial court is not one of weight, but of the sufficiency of the evidence," *State v. Mann*, 355 N.C. 294, 301, 560 S.E.2d 776, 781 (2001) (citing *Lucas*, 353 N.C. at 581, 546 S.E.2d at 721), with the trial court being required to "draw[ ] all reasonable inferences from the evidence in favor of the State's case."  *Id.* (quoting *Lucas*, 353 N.C. at 581, 546 S.E.2d at 721); *see also State v. Lowery*, 309 N.C. 763, 766, 309 S.E.2d 232, 236 (1983).  As a result, the ultimate issue raised by defendant's challenge to the sufficiency of the evidence to support his conspiracy conviction is whether a reasonable juror could have rationally concluded that defendant was guilty of the crime that he was charged with committing.

"A criminal conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act by unlawful means."  *State v. Lamb*, 342 N.C. 151, 155, 463 S.E.2d 189, 191 (1995).  "[T]he State need not prove an express agreement"; instead, "evidence tending to show a mutual, implied understanding will suffice." *State v. Morgan*, 329 N.C. 654, 658, 406 S.E.2d 833, 835 (1991); *see also State v. Lawrence*, 352 N.C. 1, 24–25, 530 S.E.2d 807, 822 (2000); *State v. Smith*, 237 N.C. 1, 16, 74 S.E.2d 291, 301 (1953).  "The existence of a conspiracy may be established by circumstantial evidence."  *State v. Bell*, 311 N.C. 131, 141, 316 S.E.2d 611, 617 (1984) (citing *State v. Bindyke*, 288 N.C. 608, 616, 220 S.E.2d 521, 526 (1975)); *see also Lawrence*, 352 N.C. at 25, 530 S.E.2d at 822 (citing *Bindyke*, 288 N.C. at 616, 220 S.E.2d at 526) (stating that "[t]he existence of a conspiracy may be shown with direct or circumstantial evidence"); *State v Horton*, 275 N.C. 651, 659, 170 S.E.2d 466, 471

(1969) (citing *State v. Butler*, 269 N.C. 733, 737, 153 S.E.2d 477, 481 (1967)) (stating that "a criminal conspiracy may be established by circumstantial evidence from which the conspiracy may be legitimately inferred"); *State v. Wrenn*, 198 N.C 260, 263, 151 S.E.2d 261, 263 (1930) (stating that the existence of a conspiracy may be "inferred from facts and circumstances"); *State v. Knotts*, 168 N.C. 173, 188, 83 S.E. 972, 979 (1914) (stating that "[t]his joint assent of minds, like all other facts of a criminal case, may be established as an inference of the jury from other facts proved; in other words, by circumstantial evidence"). As the Court recognized more than three-quarters of a century ago, "[d]irect proof of the [conspiracy] charge is not essential, for such is rarely obtainable," so that the existence of a conspiracy "may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively," "point unerringly to the existence of a conspiracy." *State v. Whiteside*, 204 N.C. 710, 712, 169 S.E. 711, 712 (1933) (citing *Wrenn*, 198 N.C. at 260, 151 S.E. at 261). "[T]he results accomplished, the divergence of those results from the course which would ordinarily be expected, the situation of the parties and their antecedent relations to each other, together with the surrounding circumstances, and the inferences legitimately deducible therefrom" provide "ample ground for concluding that a conspiracy exists." *Id.* at 713, 169 S.E.2d at 712. "Ordinarily the existence of a conspiracy is a jury question," and where reasonable minds could conclude that a meeting of the minds exists, the trial court

does not err in denying a motion to dismiss for insufficiency of the evidence. *State v. Larrimore*, 340 N.C. 119, 156, 456 S.E.2d 789, 809 (1995).

The record developed before the trial court established that Dan Mylett had been charged with and was convicted of assaulting a governmental official based upon an incident during which he spat upon an officer employed by the Boone Police Department. During the trial of that case, Dan Mylett, Dan Mylett's girlfriend Kathyn Palmer, and defendant, who is Dan Mylett's brother, appeared to be watching the members of the jury during breaks in the proceedings. For example, Charlotte Lino, who served on the jury at Dan Mylett's trial, testified that defendant and Dan Mylett "hung out . . . very close" to the door of the jury room, looked into the room, and "circl[ed] the table" in the hallway outside the jury room. In addition, Kinney Baughman, who also served on the jury at Dan Mylett's trial, testified that defendant and Dan Mylett made frequent eye contact with members of the jury during their breaks throughout the trial and that defendant, Dan Mylett, and Ms. Palmer stared at them "intently."

After the jury returned a verdict convicting Dan Mylett of assault upon a governmental official, six of the members of the jury remained in the courtroom, which was located on the second floor near a stairwell that led to the first floor entrance, for the sentencing hearing. At the conclusion of the sentencing hearing, surveillance video footage showed that defendant left the courtroom by himself before anxiously pacing the hallway outside the courtroom. When he stopped pacing,

defendant stood on the opposite side of the hallway facing the doors that led into the courtroom.

As Juror Rose Nelson left the courtroom and walked through the hallway toward the stairwell, defendant stared at her and told her that he "hoped that [she] could live with [her]self," that "[she] had convicted an innocent man," and that "he hoped that [she] slept well." According to Ms. Nelson, defendant spoke in a "very threatening" tone of voice and continued to make comments in her direction even after she entered the stairwell and began walking down the steps.

At that point, defendant re-crossed the hallway, stood between the two doors that led to the courtroom, and faced the entrance through which each of the jurors left the courtroom. While defendant stood alone in the hallway, jurors Kinney Baughman, William Dacchille, Denise Mullis, and Lorraine Ratchford left the courtroom together. As this group of jurors walked past him to enter the jury room to retrieve their belongings, defendant appears to have stared at them and told the four jurors, in an increasingly "louder," "more aggressive," and "more aggravated" manner, that his brother was "an innocent man," that they had "done wrong," and that they had "ruined [his brother's] life." Ms. Ratchford testified that defendant had "intercepted" and "accost[ed]" her as she proceeded to the jury room and said, "congratulations, you just ruined [my brother's] life." Similarly, Ms. Mullis testified that, as she walked to the jury room, defendant told her in a "very angry" tone that she had "got it wrong" and had "made a mistake." In the same vein, Mr. Dacchille

testified that defendant told him that "[Dan Mylett was] an innocent man, he's an innocent man."

At that point, Dan Mylett, Ms. Palmer, and defendant's mother, each of whom were visibly upset, left the courtroom and joined defendant in the hallway, where defendant made a brief attempt to console Ms. Palmer. Upon leaving the courtroom, Dan Mylett walked directly toward the jury room and was standing outside of that room when Mr. Baughman re-entered the hallway preparatory to leaving the building. As Mr. Baughman walked toward the far courtroom door, defendant, Dan Mylett, and Ms. Palmer approached him, with defendant having "immediately engaged" Mr. Baughman and telling Mr. Baughman that he "had done wrong" and that Dan Mylett "was an innocent man." According to surveillance video footage, defendant and Dan Mylett can be seen speaking to Mr. Baughman while defendant, Dan Mylett, and Ms. Palmer each exhibited body language that expressed dissatisfaction and frustration. Mr. Baughman testified that defendant was "clearly upset," that his tone was "firm," and that defendant was "not yelling at" him.

While still in the jury room, Mr. Dacchille could hear that those associated with Dan Mylett were engaged with Mr. Baughman. In light of his concern that things would "get[ ] out of hand[,]" Mr. Dacchille made a "bee line for the stairwell" while the group accosted Mr. Baughman. Mr. Dacchille informed a law enforcement officer that the group associated with Dan Mylett was "abusing the jury" and were "yelling at the jurors" in a "belligerent" manner.

As Mr. Baughman neared the far courtroom door, he realized that he was going the wrong way. For that reason, Mr. Baughman reversed course and attempted to make his way around Dan Mylett's supporters in order to enter the stairwell and leave the courthouse. Although Mr. Baughman attempted to "explain" the jury's verdict and to tell Dan Mylett's supporters that there "was a lot of sympathy for [Dan Mylett] in there" while walking toward the stairwell, he "immediately got pounced" by Ms. Palmer.

Upon noticing that defendant was "getting himself upset," defendant's mother can be seen on video surveillance footage making multiple attempts to pull defendant back from Mr. Baughman, "pleading with him to stop" accosting the jurors and to refrain from following Mr. Baughman, and placing her hand over defendant's mouth as he attempted to speak to Mr. Baughman once Mr. Baughman had reached the stairwell. Unfortunately, however, defendant broke free from his mother's grip and walked around her, at which point defendant and other family members followed Mr. Baughman into the stairwell, where Mr. Baughman testified that Ms. Palmer "scream[ed] and yell[ed]" that Mr. Baughman had "sent [Dan Mylett] to jail" and that he had "ruined [Dan Mylett's] life and it's all [your] fault." According to Mr. Baughman, Dan Mylett's supporters "were all pointing their fingers in [his] face" and telling him that he had "ruined [Dan's] life."

As Ms. Mullis left the jury room in order to enter the stairwell, Dan Mylett's supporters returned to the hallway. Defendant and Dan Mylett both appeared to be

staring at Ms. Mullis as they passed her; after Ms. Mullis had entered the hallway, Dan Mylett shook his head and threw his hand up. Shortly thereafter, Ms. Ratchford left the jury room and walked past Dan Mylett's supporters for the purpose of using the restroom. While she was in the restroom, Ms. Ratchford became concerned given that the actions of Dan Mylett's supporters were "so outside the bounds of propriety."

As the final juror, Ms. Lino, left the courtroom and crossed the hallway to enter the stairwell, defendant and Dan Mylett made a slight turn to face her and watched as she walked into the stairwell. Ms. Lino testified that Dan Mylett's supporters confronted her in a "loud," "angry," and "very intimidating" manner and yelled that Dan Mylett would "never get a job," that he wouldn't be able to "finish school," and that the jury "lie[d] just like the cops do." Ms. Mullis and Ms. Lino waited for Ms. Ratchford on a stairwell landing.

After the attorney who had represented Dan Mylett left the courtroom, Dan Mylett and his supporters entered the stairwell for the purpose of exiting the courthouse. Ms. Mullis and Ms. Lino were still waiting for Ms. Ratchford on the stairwell when Dan Mylett and his supporters passed them. As the group passed in close proximity to Ms. Mullis and Ms. Lino, they "shout[ed]" at them in an "angry" manner, told them "how bad [the jurors] were," and screamed that "[y]ou really blew it." Ms. Mullis testified that one member of the group had touched her, but she was unable to identify the individual who had made contact with her.

The conduct of defendant, Dan Mylett, and Ms. Palmer caused considerable consternation for the jurors whom the group had confronted. Ms. Nelson drove to her husband's place of employment immediately after leaving the courthouse and testified that she feared that she would be the subject of retaliatory conduct. Similarly, Ms. Lino purchased a security camera after her encounter with the group associated with Dan Mylett and expressed fear because she "didn't know what they were capable of doing." Mr. Baughman "spent th[e] weekend absolutely in fear of [his] life," considered "leaving town," checked to see that his security cameras were in good working order, and took leave from his employment to cope with his emotional distress, describing his encounter with Dan Mylett and his group as "one of the most disturbing experiences of [his] life." All of the jurors that defendant, Dan Mylett, and Ms. Palmer confronted feared for their safety after the incident in question, with a number indicating that they would refuse to serve on another jury in the future.

I have no hesitation in concluding that this evidence, when taken in the light most favorable to the State and considered in the light of the legal standard enunciated by this Court in *Whiteside*, amply supports a determination that defendant, Dan Mylett, and Ms. Palmer conspired to threaten or intimidate the members of the jury that convicted Dan Mylett of assaulting a governmental official. As a result of the fact that defendant and Dan Mylett were brothers and the fact that defendant's attempt to console Ms. Palmer permits an inference that there was a close affinity between the two of them as well, the jury could reasonably infer that all three

of the alleged conspirators had "antecedent relations" with each other. *Whiteside*, 204 N.C. at 713, 169 S.E. at 712. The record evidence further shows that, even before the trial ended, defendant and Dan Mylett were placing themselves in close proximity to the members of the jury and engaging in actions that most people would find threatening or intimidating. After the jury returned its verdict, defendant, Dan Mylett, and Ms. Palmer, who were standing in close proximity to each other, confronted multiple jurors and made angry and provocative remarks to them that succeeded in placing the jurors in an exceedingly frightening position. As they did so, defendant, Dan Mylett, and Ms. Palmer said essentially the same kinds of things to multiple jurors simultaneously even though conduct of this nature "diverge[s]" from "the course which would ordinarily be expected" of responsible persons in the vicinity of a court of justice. *Id.*

I am satisfied that, when evaluating the evidence in this case in light of the analytical rubric suggested by this Court in *Whiteside*, a decision that continues to be cited by this Court for the purpose of describing the circumstances under which the agreement necessary to support a conspiracy conviction exists, *see, e.g., State v. Winkler*, 368 N.C. 572, 576, 780 S.E.2d 824, 827 (2015), a reasonable juror could have easily found that there was a "mutual, implied understanding" between defendant, Dan Mylett, and Ms. Palmer to threaten or intimidate the members of the jury that convicted Dan Mylett of assaulting a governmental official, *Morgan*, 329 N.C. at 658, 406 S.E.2d at 835, given that each of these three individuals were "able mentally to

appreciate" each other's conduct so as to make an implicit "agree[ment] to cooperate in the achievement of that objective" of threatening or intimidating the departing members of the jury. *State v. Sanders*, 208 N.C. App. 142, 146, 701 S.E.2d 380, 383 (2010) (citing 15A C.J.S. *Conspiracy* § 114 (2002)). For that reason, I believe that the evidence, when taken in the light most favorable to the State, permitted the jury to find the existence of the necessary agreement between defendant, Dan Mylett, and Ms. Palmer to threaten or intimidate a juror, *see Winkler*, 368 N.C. at 581–82, 780 S.E.2d at 829 (holding that evidence tending to show that defendant had mailed an unmarked bottle that had been stuffed with tissue to prevent it from rattling and which contained controlled substances to an individual with whom he had a prior relationship using an address which the individual had not provided to his probation officer and evidence that defendant was unable to account for the remaining controlled substances that he should have possessed based upon the prescriptions that had been written for him or his reasons for mailing the controlled substances rather than simply carrying them on his person was sufficient to support the defendant's conspiracy conviction); *Lawrence*, 352 N.C. at 25, 530 S.E.2d at 822 (stating that "[t]he mutual, implied understanding between defendant and [his alleged co-conspirator] is apparent from the effortless manner in which they supported each other throughout the commission of the murder and kidnaping"); *State v. Gibbs*, 335 N.C. 1, 48–49, 436 S.E.2d 321, 348 (1993) (holding that evidence tending to show that the defendant and his alleged co-conspirator watched another

person leave a residence before approaching it and cooperating in the commission of a burglary constituted sufficient evidence to support the defendant's conspiracy conviction); *State v. Polk*, 309 N.C. 559, 565, 308 S.E.2d 296, 299 (1983) (holding that evidence tending to show that three different individuals committed a series of sexual assaults upon the prosecuting witness after luring her to a secluded location was sufficient to support the defendant's conspiracy conviction), with the evidence of defendant's guilt in this case consisting of much more than "evidence of mere relationship between the parties . . . ." *State v. Williams*, 255 N.C. 82, 86, 120 S.E.2d 442, 446 (1961) (quoting *State v. Phillips*, 240 N.C. 516, 521, 82 S.E.2d 762, 766 (1954)).

In reaching a contrary conclusion, the Court asserts that "[t]he evidence is almost entirely devoid of any interactions between [defendant, Dan Mylett, or Ms. Palmer] from which the formation of any agreement can be inferred." As has already been demonstrated, however, well-established North Carolina law permits a jury to find the necessary agreement based upon "a mutual, implied understanding." *Morgan*, 329 N.C. at 658, 406 S.E.2d at 835. Thus, while I agree with my colleagues that the record does not contain any direct evidence of an explicit agreement between defendant, Dan Mylett, and Ms. Palmer to threaten or intimidate the members of the jury that convicted Dan Mylett of spitting on a law enforcement officer, the absence of such evidence does not stand as an obstacle to the finding of an unlawful, implied understanding sufficient to support defendant's conspiracy conviction.

In addition, while acknowledging that the agreement necessary to support a conspiracy conviction can be inferred from "parallel conduct," the Court disregards the extensive evidence that defendant, Dan Mylett, and Ms. Palmer engaged in highly "parallel" conduct when they confronted members of the jury that convicted Dan Mylett of assaulting a governmental official on the grounds that "such an inference would be far stronger where the conduct at issue is more synchronized, more parallel, and more clearly in furtherance of a crime." Aside from the fact that this portion of the Court's analysis appears to me to amount to an analysis of the weight that should be given to the State's evidence, rather than to its sufficiency, and the fact that the rubric upon which the Court relies in rejecting the State's "parallel conduct" analysis fails to track the approach that the Court adopted in *Whiteside* and lacks support in any of our prior decisions, I am unable to agree with my colleagues that the conduct in which defendant, Dan Mylett, and Ms. Palmer engaged was not "particularly synchronized," "parallel," or "in furtherance of a crime." In my opinion, the fact that defendant, Dan Mylett, and Ms. Palmer did essentially the same things to the same people in the same place and at the same time shows that the actions of each alleged co-conspirator closely "synchronized" with and "paralleled" the actions of the others. In addition, aside from the fact that proof that the alleged conspirators actually committed a crime is not a prerequisite for a conspiracy conviction, *Bindyke*, 288 N.C. at 616, 220 S.E.2d at 526 (citing *State v. Lea*, 203 N.C. 13, 27, 164 S.E. 737, 745 (1932)) (stating that "[t]he conspiracy is the crime and not its execution"), the record

evidence clearly indicates that defendant, Dan Mylett, and Ms. Palmer, acting as a group and engaging in remarkably similar conduct, amply succeeded in threatening or intimidating the jurors whom they accosted in the hallway outside the courtroom.[1] Thus, I do not believe that any of the reasons that my colleagues have advanced in support of their decision to find the evidence insufficient to show the existence of the agreement necessary for defendant's conspiracy conviction are persuasive and would, on the contrary, find that the record contained sufficient evidence to permit a reasonable juror to infer that defendant, Dan Mylett, and Ms. Palmer conspired to threaten or intimidate the members of the jury that convicted Dan Mylett of assaulting a governmental official. As a result, rather than overturning defendant's conviction, I believe that the Court should proceed to address defendant's remaining challenges to the trial court's judgment, including his various constitutional claims, about the merits of which I express no opinion.

Justices NEWBY and DAVIS join in this dissenting opinion.

---

[1] As a matter of clarity, I do not understand either defendant, the dissenting judge at the Court of Appeals, or the majority of this Court to be stating that the record failed to contain sufficient evidence to establish that the conduct of defendant, Dan Mylett, and Ms. Palmer did threaten or intimidate the jurors who voted to convict Dan Mylett of spitting upon a law enforcement officer. Instead, my understanding is that defendant, the dissenting judge, and the majority of this Court have argued or concluded that the record does not show the existence of the agreement necessary to support defendant's conspiracy conviction. In light of this fact and the fact that the record contains ample evidence tending to show that the conduct of the group associated with Dan Mylett had the effect of threatening or intimidating the relevant jurors, I have focused the discussion contained in the text of this dissenting opinion upon the "agreement" issue rather than any "threaten or intimidate" issue.